**UNITED STATES of America, Appellee,**

v.

**Frank MANGAN and Kevin Mangan, Defendants-Appellants.**

**Nos. 553 and 554, Dockets 77–1326 and 77–1339.**

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 1978.

Decided April 3, 1978.

Henry Winestine, New York City (Martin Erdmann, The Legal Aid Society, New York City, of counsel), for defendant-appellant Frank Mangan.

Lawrence Stern, Brooklyn, N. Y., for defendant-appellant Kevin Mangan.

James P. Lavin, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., Southern Dist. of New York, and Jeffrey E. Livingston, Richard F. Ziegler, Robert N. Shwartz, and Audrey Strauss, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before FRIENDLY and VAN GRAAF-EILAND, Circuit Judges, and DOOLING, Senior District Judge.*

FRIENDLY, Circuit Judge:

■ Fraud, Lord Macnaghten said, *Reddaway v. Banham*, [1896] A.C. 199, 211, is "infinite in variety." These appeals reveal a variety new at least to us. The fraud became possible because appellant Frank Mangan was an IRS Agent, working at the Mineola, L.I., office. According to the Government, the scheme, perpetrated by Frank and his brother Kevin, was this: Frank obtained the names and social security numbers of seven taxpayers, six named John McCarthy and the seventh Scott Murphy.[1] In January and February 1972, Frank prepared 1971 income tax returns for these taxpayers and caused them to be filed. Each was accompanied by a W–2 tax withholding form showing that the seven taxpayers had worked for Atlas Investing Co., Inc., Ace Industries, Inc. or Admiral Realty Co., Inc.,[2] and that they had withholdings ranging from $12,000 to $14,000. The returns claimed partnership losses sufficient to entitle each taxpayer to a refund in the $9,000 range and gave false addresses at rooming houses and transient hotels on the upper west side of Manhattan, where Kevin had rented rooms in the taxpayers' names. The Government mailed refund checks to six of the taxpayers at these addresses.[3] Four McCarthy checks and the Murphy check were picked up and deposited in bank accounts that Kevin had opened in their names at four different locations.[4]

---

* Of the District Court for the Eastern District of New York, sitting by designation.

1. The favor thus shown to taxpayers of Irish origin was doubtless related to the need for Kevin's renting rooms and opening bank accounts in their names.

2. Apparently, these companies were fictitious. A tax examiner from the IRS testified that she was unable to locate a telephone listing for any of them.

3. The check for one of the John McCarthys was not mailed because the return used a temporary Social Security number assigned by the IRS for internal purposes and unavailable to anyone outside the Service.

4. One of the McCarthy checks was never negotiated.

The proceeds were withdrawn in cash during March and April, 1972. An accomplice, John Bertsch, gave substantial testimony concerning Kevin's activity in renting the rooms, picking up the checks, and opening and then closing the bank accounts. Kevin gave Bertsch $20,000 to $25,000 of the refund money. Bertsch testified that he spent a part of this and returned the balance to Kevin. Other evidence will be discussed in the course of this opinion.

A grand jury returned a thirteen count indictment with Count I charging conspiracy to file false claims against the United States in violation of 18 U.S.C. § 286, Counts II–VI charging use of the mails to defraud in violation of 18 U.S.C. § 1341 and Counts VII–XIII charging the filing of false and fraudulent income tax returns in violation of IRS § 7206(1). The jury convicted on all counts. Judge Stewart sentenced Frank Mangan to concurrent terms of two years on each count. He sentenced Kevin Mangan to concurrent terms of imprisonment of one year and a day on Counts I, II, III, IV, VII, VIII and IX; as to the remaining counts, V and VI (mail fraud), and X, XI, XII and XIII (filing false and fraudulent income tax returns), he suspended sentence and placed Kevin on probation for three years to commence upon his release from imprisonment. Each of the defendants has mounted a number of attacks upon his conviction and, pursuant to F.R. App.P. 28(i), has adopted the contentions of the other.

*(1) Availability of Frank Mangan's tax returns under Title XII of the Tax Reform Act of 1976.*

The Government's case against Frank Mangan rested in important part on his own income tax returns for 1971 through 1975. The handwritings on the body of the 1971 and 1973 returns were used as exemplars of Frank's handwriting and afforded the basis for an expert's opinion that the writing had been done by the same person who had prepared the fictitious McCarthy and Murphy returns. Another witness used the 1972 and 1973 returns as a basis for

testimony that during 1972, when refunds were paid on the false returns, Frank made investments in securities which required him to supply new capital of $12,000. The same witness also pointed out that Frank Mangan's return for each of the years from 1971 to 1975 claimed partnership losses—the same device used to produce the refund claims in the fictitious returns. The court received the returns in evidence over vigorous objection that this was prohibited by the confidentiality provisions recently enacted by Title XII of the Tax Reform Act of 1976, P.L. No. 94–455, now insofar as here pertinent I.R.C. §§ 6103, 7213 and 7217.

At first blush it would seem peculiar that there should be any bar to the Government's use of the returns of an allegedly faithless Internal Revenue Agent in a criminal prosecution against him for swindling the Treasury. However, the matter cannot be disposed of so readily.

While § 6103 stretches over 20 pages of the Internal Revenue Code, only a few provisions require mention here. A basic point is the distinction drawn in the statute between the disclosure of returns in matters relating to "tax administration" and other matters. Section 6103(b)(4)(A) defines "tax administration" as follows:

(i) the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party, and

(ii) the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions . . .

Subsection (B) specifies that this includes: assessment, collection, enforcement, litigation, publication, and statistical gathering functions under such laws, statutes, or conventions.

Section 6103(h)(2) says that:

A return or return information shall be open to inspection by or disclosure to

attorneys of the Department of Justice (including United States attorneys) personally and directly engaged in, and solely for their use in, preparation for any proceeding (or investigation which may result in such a proceeding) before a Federal grand jury or any Federal or State court in a matter involving tax administration, but only if—

(A) the taxpayer is or may be a party to such proceeding;

(B) the treatment of an item reflected on such return is or may be related to the resolution of an issue in the proceeding or investigation; or

(C) such return or return information relates or may relate to a transactional relationship between a person who is or may be a party to the proceeding and the taxpayer which affects, or may affect, the resolution of an issue in such proceeding or investigation.

Under subsection (h)(3), if "the Secretary" [5] has referred a case to the Department of Justice, he may make such disclosure to it on his own motion. Otherwise he may do this only on the basis of a written request from the Attorney General, the Deputy Attorney General, or an Assistant Attorney General. Section 6103(h)(4) deals separately with disclosure in a judicial or administrative proceeding pertaining to tax administration. There disclosure is permitted if the case falls within one of the three conditions listed in § 6103(h)(2) or another not here pertinent; nothing is said with respect to the need for any "request."

Section 6103(i) lays down a more severe procedure in judicial or administrative proceedings not involving tax administration. Here the linchpin as regards taxpayer returns is a provision, § 6103(i)(1)(B), whereby the head of any Federal agency which is or may be a party to a proceeding to enforce a Federal criminal statute or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, or an Assistant Attorney General may apply *ex parte* to a federal district judge for an order which is to be granted if the judge determines that:

(i) there is reasonable cause to believe, based upon information believed to be reliable, that a specific criminal act has been committed;

(ii) there is reason to believe that such return or return information is probative evidence of a matter in issue related to the commission of such criminal act; and

(iii) the information sought to be disclosed cannot reasonably be obtained from any other source, unless it is determined that, notwithstanding the reasonable availability of the information from another source, the return or return information sought constitutes the most probative evidence of a matter in issue relating to the commission of such criminal act.

Subsection (4) provides, *inter alia*, that a return obtained by this type of search warrant procedure "may be entered into evidence in any administrative or judicial proceeding pertaining to enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or an agency . . . is a party . . . only if the court finds that [the] return" is probative of a matter in issue relevant in establishing the commission of a crime or the guilt of a party. Subsection (4) concludes by saying:

The admission into evidence of any return or return information contrary to the provisions of this paragraph shall not, as such, constitute reversible error upon appeal of a judgment in such proceeding.

---

**5.** In contradistinction to provisions referring to "the Secretary of the Treasury," "the Secretary" also includes his duly authorized delegate, 26 U.S.C. § 7701(11). The delegation under § 6103(h) is found in Commissioner's Delegation Order No. 156, paragraph 2, 1976 CCH Federal Tax Reporter ¶ 6666. The persons delegated the power in question are: Regional Commissioners, Assistant Commissioner (Compliance), District Directors, Service Center Directors, the Director of International Operations and the Chief, Disclosure Staff. Redelegation is permitted only to Assistant District and Service Center Directors, Assistants to the District and Service Center Directors, Division Chiefs, Assistant Chief, Disclosure Staff, and Disclosure Officers.

Although counsel for Frank Mangan had been advised well in advance of trial of the Government's intention to introduce his tax returns, he made no motion to suppress under F.R.Cr.P. 12(b)(3).[6] Because of the lack of a suppression hearing, the record as to how Frank Mangan's tax returns got into the prosecutor's hands is not altogether clear. In answer to a question from the judge the Assistant United States Attorney stated that he had made no request for them, but that an IRS inspector had "pulled" the returns before the case was referred to the United States Attorney and "brought them over." He added that "the Inspection Service brought the case to our office without our request."

■ Proceeding to the merits of defendant's claim despite the untimeliness of his motion, the district judge ruled the proceeding to be one "pertaining to tax administration," although the indictment included false claim and mail fraud counts. Apparently he considered disclosure to the United States Attorney to have been proper under § 6103(h)(2) and (3), since "the Secretary" had referred the case to the Department, and consequently found no bar to disclosure in court under § 6103(h)(4). Alternatively, if the matter was not one of tax adminis-

tration, he was prepared to enter an order under § 6103(i)(1)(B).

We do not agree that action of the latter type would have been proper. The statute requires that an application for an order under the cited section, in the case of the Department of Justice, shall be made by the Attorney General, the Deputy Attorney General, or an Assistant Attorney General. When Congress chooses to speak with such specificity, courts must heed its language. *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 1341 (1974). Since § 6103(i)(4), in contrast to § 6103(h)(4), keys admissibility of returns in judicial or administrative proceedings to compliance with one of the procedures prescribed in the earlier subdivisions with respect to disclosure to a Federal agency, we could support admission of the returns if the case were not one of tax administration only by accepting the Government's argument in regard to the failure to comply with F.R.Cr.P. 12(c), see note 6 *supra*, or possibly by relying on the Delphic final sentence of subsection (i)(4).[7]

■ We need not decide these questions, however, since the district judge was

---

6. The Government contends that this failure alone suffices to dispose of Frank Mangan's objections. Appellant argues, primarily on the basis of the recency of the 1976 statute at the time of trial, that this was an appropriate case for granting relief under F.R.Cr.P. 12(f) from the strictures of F.R.Cr.P. 12(c). While the district judge found that under Rule 12 the motion should have been presented earlier, he declined to rest his decision "solely on that ground."

7. Stressing the words "as such," appellant argues that the sentence does not apply when the admission of the returns was "prejudicial" in the sense of having a significant tendency to promote a verdict of guilty. Since, apart from the special provision in a particular statute or perhaps when the error is of constitutional proportions, a court would not reverse because of the admission of evidence not having that effect, 28 U.S.C. § 2111; F.R.Cr.P. 52(a), the final sentence of § 6103(i)(4) under appellant's construction would have accomplished nothing. However, this still leaves us wondering what Congress meant by the "as such" phrase. It is also to be noted that literally the sentence applies only to action "contrary to the provisions

of this paragraph" and thus leaves arguable the question whether it includes error in an underlying proceeding under § 6103(i)(1)(B). See Senate Comm. on Finance, Compilation of Decisions Reached in Executive Session, 94th Cong., 2d Sess. 63 (Comm. Print 1976):

> Once the Justice Department or any Federal agency has received return information pursuant to a court order, further disclosure thereof in an administrative hearing or trial relating to the violation of the nontax criminal law would not be allowed unless there is a showing to the presiding hearing officer or judge that such return information is directly probative of the defendant's guilt. Admission of the return in this proceeding would not constitute reversible error in the event of an appeal of a District Court's findings in the nontax criminal case.

See also S.Rep.No.94–938, 94th Cong., 2d Sess. 329–330 (1976), U.S.Code Cong. & Admin. News 1976, pp. 2827, 3759. A further curiosity is the absence of a counterpart for the final sentence of § 6103(i)(4) in the corresponding "tax administration" paragraph § 6103(h)(4).

right in regarding the case as one of "tax administration."[8] To be sure, one's initial impression might be that the simpler requirements for matters of "tax administration" related only to disputes between the Government and a taxpayer whose returns were relevant to his own tax liability and not to a controversy where the Government uses the returns of an employee of the Internal Revenue Service to prove that he defrauded it by obtaining refunds in the names of other taxpayers. In support of that view appellant refers us to the statement in the Senate Report that:

> While the committee decided to maintain the present rules pertaining to the disclosure of returns and return information of the taxpayer whose civil and criminal tax liability is at issue, restrictions were imposed in certain instances at the pre-trial and trial levels with respect to the use of third-party returns where, after comparing the minimal benefits derived from the standpoint of tax administration to the potential abuse of privacy, the committee concluded that the particular disclosure involved was unwarranted.

S.Rep.No.94–938, 94th Cong., 2d Sess. 324–25 (1976), U.S.Code Cong. & Admin.News 1976, p. 3754. We do not find this persuasive. While defendant focuses on the first part of the quotation with its reference to taxpayers "whose civil and criminal tax liability is at issue," the passage in its entirety attempts merely to draw the distinction between these taxpayers and others whose liability was not at issue. This language does not evidence an intention to adopt a restrictive interpretation of "tax administration."[9] Furthermore, the definition of "tax administration" in § 6103(b)(4) is so sweeping as to compel rejection of a restrictive interpretation. Clearly this case involved "the administration, management, [and] conduct . . . of the execution and application of the internal revenue laws" and "assessment, collection, enforcement [and] litigation . . . functions under such laws." Even if the Senate Report was more restrictive than we think it to have been, this would be a case in which to apply "the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." *Greenwood v. United States*, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956) (Frankfurter, J.). It follows that under § 6103(b)(4) and (h)(4) the United States Attorney could properly have obtained a subpoena for the returns for use before the grand jury or at trial. See F.R.Cr.P. 17(c).

▮▮▮ Appellant argues, however, that this was not what was done; that his returns were sent to the Assistant United States Attorney pursuant to § 6103(h)(3); that there was no written request from the

---

8. Alternatively we note that defendant failed to introduce any evidence that the transfer of his returns to the United States Attorney's office occurred after January 1, 1977, the effective date of the statute. See P.L. No. 94–455 § 1202(i). Since the indictment was returned on March 2, 1977, it is quite plausible that the referral from the IRS occurred in 1976. In any event, it was defendant's responsibility to prove otherwise. *United States v. Masterson*, 383 F.2d 610, 614 (2 Cir. 1967), *cert. denied*, 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968); *United States v. Capra*, 501 F.2d 267 (2 Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). While the prior law requires the same determination we are asked to make here as to whether the return was properly transferred from the IRS to the United States Attorney, the regulations stated broadly:

> Returns or copies thereof will be furnished without written application therefor to United States attorneys and attorneys of the De-

partment of Justice for official use in the prosecution of claims and demands by, and offenses against, the United States . . . in cases arising under the internal revenue laws or related statutes which were referred by the Department of the Treasury to the Department of Justice for such prosecution or defense.

26 C.F.R. § 301.6103(a)–1(h). This case fits that description. See 26 C.F.R. § 404.6103(a)–1 (permitting disclosure of returns obtained before January 1, 1977 in proceedings described in § 6103(i)(4) if the requirements of that section are met).

9. Our view that in referring to "civil and criminal tax liability," Congress meant to include all liability under the tax laws is bolstered by the repeated references in the Senate Report to proceedings under § 6103(i) as involving "non-tax crimes," a rubric that hardly encompasses the offenses here.

Attorney General, the Deputy Attorney General, or an Assistant Attorney General under § 6103(h)(3)(B); and that there is no evidence that the referral of the case by the Treasury or the disclosure of the returns was made by "the Secretary," see footnote 5 *supra.* As previously recounted, due to the failure of appellant's counsel either to make a pretrial motion to suppress or to ask the court to interrupt the trial to enable him to make a proper record, we simply do not know what procedures occurred in the Treasury. Appellant should not profit from his own failure to develop a proper record. Although, like the trial judge, see footnote 6 *supra,* we do not choose to rely on F.R. Cr.P. 12(c) as an absolute bar to consideration of Frank Mangan's claim for suppression, he still had the burden of making out a case for his motion. In the absence of contrary evidence the presumption of regularity, *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); *Lewis v. United States,* 279 U.S. 63, 73, 49 S.Ct. 257, 73 L.Ed. 615 (1929); *United States v. Hulphers,* 421 F.2d 1291 (9 Cir. 1969); IX Wigmore, Evidence § 2534 (3d ed. 1940 & 1972 Supp.), is applicable. Moreover, we are not at all convinced that Congress intended that disclosure of a return to a United States Attorney in violation of a formal requirement of § 6103(h)(3) should "poison" its subsequent disclosure in a judicial proceeding that was permissible under § 6103(h)(4). As noted earlier, § 6103(i)(4) specifically conditions admissibility on compliance with provisions governing disclosure to Federal agencies, while § 6103(h)(4) has no such specific requirement. The final sentence of § 6103(i)(4), although not directly applicable, see note 7 *supra,* and the provision of civil penalties (including allowance for punitive damages for grossly negligent violations) as well as criminal sanctions, §§ 7217 and 7213, afford some evidence that Congress did not desire the courts to apply the exclusionary rule mechanically to every violation of § 6103.

**10.** This provides:

The *admitted or proved* handwriting of any person shall be admissible, for purposes of

(2) *Lack of authentication of exemplars of Frank Mangan's handwriting.*

The Government's handwriting expert, Louis Caputo, associated with the New York City Department of Investigation, used as exemplars of Frank Mangan's handwriting the body of two of his federal income tax returns discussed above and forms contained in Frank Mangan's personnel file, which were written mostly in block capitals as were the fictitious returns. Although no witness testified that these were indeed written by Frank Mangan, the judge permitted them to be used as exemplars because of the statutory presumption, IRC § 6064, of the genuineness of the signatures on the tax returns, the similarity of these signatures to those in the IRS personnel files, the fact that the papers in the personnel file were of the sort that normally would be filled out by the employee, and the similarity of the material in block capitals on the returns and on the personnel forms. Appellant claims that this violated 28 U.S.C. § 1731,[10] is contrary to the principle announced in VII Wigmore, *supra* § 2148, and is unsupported by authority, including Federal Rule of Evidence 901. Conceding that *United States v. Liguori,* 373 F.2d 304 (2 Cir. 1967), lends considerable support to the use of the income tax returns and papers in the personnel file as exemplars, appellant argues that *Liguori* "appears to depart from the mainstream" and that its precedential value is weakened by the lack of adequate briefing.

Be all that as it may, the issue is now governed by Rule 901. Subdivision (a) lays down a general test,

(a) General provision.—The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims . . . ,

and subdivision (b) gives several illustrations of sufficient authentication, one of which is

comparison, to determine genuineness of other handwriting attributed to such person. (Emphasis supplied).

(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Weinstein & Berger's Commentary on the Federal Rules states, ¶ 901(b)(4)[01] at 901–47, that "Wigmore's conclusion that mere contents will not suffice unless only the author would have known the details is contrary to the federal rules and unsound" (footnote omitted) and that "[T]he common law prejudice against self-authenticating documents is not carried over into the Federal Rules." Against this appellant points to the fact that the body of income tax returns is often written by someone other than the taxpayer. However, appellant advances no explanation as to who else could have written the material in his personnel files and the handwriting expert later testified, as the judge was aware he would, that the lettering on these was penned by the same person as penned that in the income tax returns. We hold the exemplars were sufficiently authenticated, cf. *Scharfenberger v. Wingo,* 542 F.2d 328, 336–37 (6 Cir. 1976).

(3) *Admission of Kevin Mangan's statements against Frank.*

 Bertsch testified to statements by Kevin Mangan that implicated Frank. In a number of conversations in late 1971, Kevin gave a general description of the conspiracy which was to begin operations in early January. He described Frank's role as picking out the names of taxpayers and filing returns to "beat these legitimate taxpayers to their own money"; Kevin's role was to rent apartments in the taxpayers' names, open phony bank accounts and pick up the refund checks. Later Kevin stated that since he would be doing most of the work, he intended to cheat Frank out of the latter's agreed half share by advising that one of the refund checks had not been received and keeping it himself. Frank's counsel objected to the receipt of these statements on the basis of this court's decision in *United States v. Puco,* 476 F.2d 1099 (2 Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973).[11] Later he moved to strike the testimony on the ground of insufficiency of the independent evidence to show that Frank was a member of the conspiracy under the test laid down in *United States v. Geaney,* 417 F.2d 1116 (2 Cir. 1969), *cert. denied sub nom., Lynch v. United States,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). On appeal counsel seeks to add the ground that the statements were not shown to have been in furtherance of the conspiracy, long made a requirement for admissibility by this court and now embodied in Rule 801(d)(2)(E).

Although noting the statement in fn. 14 to *United States v. Nixon,* 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 41 L.Ed.2d 1029 (1974), that "As a preliminary matter, there must be substantial, independent evidence of the conspiracy, at least enough to take the question to the jury," appellant's counsel recognizes that we have declined to follow this dictum, contained in a footnote in a case where the Court's attention was focused on issues considerably transcending the rule of evidence relating to declarations of conspirators, and have adhered to our view that in the judge's passing upon the preliminary issue of admissibility, it suffices if the independent evidence establishes the defendant's participation by a "fair preponderance." *United States v. Wiley,* 519 F.2d 1348, 1350–51 (2 Cir. 1975), *cert. denied sub nom. James v. United States,* 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976); *United States v. Glazer,* 532 F.2d 224, 228–29 (2 Cir.), *cert. denied,* 429 U.S. 844, 97 S.Ct. 123, 50 L.Ed.2d 115 (1976). In *United States v. Stanchich,* 550 F.2d 1294, 1299 n. 4 (2 Cir.

---

11. The denial of certiorari was on the defendant's petition; the Government, having prevailed on the merits in this court, could not seek certiorari despite its serious disagreement with the opinion. Four judges of this court in active service had dissented from the denial of the Government's request for reconsideration of the opinion en banc. Former Chief Judge Lumbard, who had been a member of the panel, dissented from its denial of the Government's petition for rehearing with respect to the opinion but, as a senior judge, could not vote on the petition for rehearing en banc.

1977), we again adhered to the *Geaney* preponderance test, despite the appellant's reliance on the contrary holding in *United States v. Oliva*, 497 F.2d 130 (5 Cir. 1974); we pointed out that, in our view, the Federal Rules of Evidence reinforced our conclusion. Proof that Frank Mangan was the scrivener of the fictitious returns was sufficient independent evidence of his membership in the conspiracy on our preponderance test and perhaps even on a more stringent one. Such proof was afforded by the testimony of the handwriting expert Caputo and by testimony concerning the similarities in the deductions claimed on Frank's and the fraudulent returns. In addition, the facts that Frank had access to the IRS files and was Kevin's brother provided evidence, which although insufficient by itself, added to the picture.

 The question whether the statements were in furtherance of the conspiracy is much closer. It has been said that the decision of the framers of the Federal Rules of Evidence to retain this requirement despite its previous abandonment in the ALI Model Code of Evidence (1942), Rule 508(b), and Uniform Rule of Evidence 63(1)(b) (1953), "should be viewed as mandating a construction of the 'in furtherance' requirement protective of defendants," that "[n]arrative declarations should not be admitted as a matter of course" and that "statements of confession should be carefully scrutinized." 4 Weinstein & Berger, *supra*, ¶ 801(d)(2)(E)[01] at 801–147. However, the authors recognize the limited usefulness of such generalities; they agree that "[w]hether a particular statement tends to advance the objectives of the conspiracy can only be determined by examination of the context in which it is made." *Id.* at 801–148.

Kevin's statements were surely not "confessions" and were not narrative in the usual sense of describing past or contemporaneous events, cf. *United States v. Birnbaum*, 337 F.2d 490 (2 Cir. 1964); *Salazar v. United States*, 405 F.2d 74 (9 Cir. 1968). They looked rather to the future.[12] The Government argues that they were in furtherance of the conspiracy since they were made to induce Bertsch to join it or to prepare him for his intended role. See *United States v. Jackson*, 549 F.2d 517, 533–34 (8 Cir.), *cert. denied sub nom. Muhammad v. United States*, 430 U.S. 985, 97 S.Ct.

---

12. Indeed, the Government argues that Frank's statements were admissible as declarations of intention under the principle of *Mutual Life Ins. Co. of New York v. Hillmon*, 145 U.S. 285, 295–300, 12 S.Ct. 909, 36 L.Ed.2d 706 (1892), see *United States v. Annunziato*, 293 F.2d 373, 377–78 (2 Cir.), *cert. denied*, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961), and Judge Renfrew's illuminating discussion in *United States v. Pheaster*, 544 F.2d 353, 374–80 (9 Cir. 1976). The argument is not without force. As pointed out in these opinions, the *Hillmon* opinion had directed, whether rightly or wrongly, admission of Walters' letter to prove not only what Walters was going to do but also what Hillmon was going to do ("he [Walters] had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon . . . ." 145 U.S. at 296, 12 S.Ct. at 913); on a parity of reasoning, Kevin's declarations (or at least the first one) might be admissible to show Frank's plans as well as his own. Because of confusion generated by the Federal Rules of Evidence, we prefer not to rely on this ground. Rule 803(3) creates a hearsay exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design . . . )

. . . ," and the Advisory Committee's comment on this exception stated that the rule of *Hillmon* "allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed." In contrast the Report of the House Judiciary Committee on Rule 803(3) stated:

Rule 803(3) was approved in the form submitted by the Court to Congress. However, the Committee intends that the Rule be construed to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295–300, 12 S.Ct. 909, 36 L.Ed.2d 706 (1892), so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person.

The Senate Committee was silent and the Conference Report consequently did not comment. Are the Senate and the President or, for that matter, the members of the House who were not on the Committee to be considered to have adopted the text of the Rule, as glossed by the Advisory Committee's Note that Rule 803(3) enacted *Hillmon*, or the House Committee's "construction" which, in effect, seriously restricts *Hillmon* ?

1682, 52 L.Ed.2d 379 (1977). The declarations are somewhat removed in this aspect from the statement by one conspirator to another in *Geaney*, 417 F.2d at 1118, that a new recruit "was going to take Dennis [Geaney's] place"—a statement needed to reassure the listener that despite Geaney's defection everything was still proceeding according to plan. Bertsch, who was already in Kevin's employ, did not say in so many words that during the conversations in which the conspiracy was explained Kevin was preparing him or soliciting him to participate. On the other hand Bertsch did become an active participant shortly thereafter and it is hard to see what purpose Kevin could have had in making either statement to Bertsch if it was not to enlist his aid or, his aid having been proffered, to brief him on the scheme. In any event, so far as Rule 801(b)(2)(E) is concerned the failure to object at trial on the ground of furtherance is dispositive, see *United States v. Indiviglio*, 352 F.2d 276 (2 Cir. 1965), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); *United States v. Bennett*, 409 F.2d 888, 893 (2 Cir.), *cert. denied*, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969); F.R.Evid. 103(a)(1). If objection had been taken, the Government might have been able to elicit further testimony from Bertsch showing that the statements were indeed made to brief him or to induce him to enter the conspiracy; in the absence of such testimony, the judge might have excluded the statements and we would not now be asked to reverse convictions rendered after a three week trial because they were admitted without objection on this score. Cf. *United States v. Marchand*, 564 F.2d 983, 998 (2 Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978).

**13.** Two cases in this circuit have ruled that the hearsay testimony before them was not "crucial" to the Government's case or "devastating" to the defense. See *United States v. White*, 553 F.2d 310, 314 (2 Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977); *United States v. Masullo*, 489 F.2d 217, 224 (2 Cir. 1973). This proves little, since in neither case did the court consider whether

This leaves us with *United States v. Puco, supra*, 476 F.2d at 1102, which read the plurality opinion in *Dutton v. Evans*, 400 U.S. 74, 81–82, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), as requiring further scrutiny even of statements properly received under the exception for declarations of a co-conspirator. The scope of *Puco* scrutiny was severely limited in cases like this by the supplemental opinion. In denying the Government's petition for rehearing the panel majority there said they "did not and do not hold that a trial judge must find, before admitting a co-conspirator's declarations, that it is not 'crucial' to the Government's case, or 'devastating' to the defense"—the language of the plurality opinion in *Dutton*, 476 F.2d at 1107. See *United States v. Manfredi*, 488 F.2d 588, 596 (2 Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974), (no need to determine impact of evidence).[13] They added, 476 F.2d at 1107, that

> In most cases the determination that a declaration is in furtherance of the conspiracy—a determination that the trial judge now must make in every case for admissibility [2]—will decide whether sufficient indicia of reliability were present.
>
> [2] Along with the determination that there is sufficient other evidence to establish that the defendant against whom the declaration is offered was a member of the conspiracy when the declaration was made.

If Kevin's statements to Bertsch were in furtherance of the conspiracy, this would end the matter. Even if they were not but were nevertheless properly received under the co-conspirator exception because of lack of objection on the furtherance ground, they pass *Puco* muster. Outlining a criminal design of this sort is not the kind of statement likely to be made as a boast or as

"crucial" or "devastating" evidence must be excluded. In *United States v. Oates*, 560 F.2d 45, 80–84 (2 Cir. 1977), the court discussed but pointedly did not decide whether the impact of proffered hearsay evidence triggered a requirement that the Government show the declarant to be unavailable. Had the Government been called upon to make such a showing here, it clearly could have done so.

idle gossip, cf. Rule 804(b)(3).[14] The declarations also meet the test which the Ninth Circuit has developed in an effort to implement the plurality opinion in *Dutton v. Evans.* See *United States v. Snow,* 521 F.2d 730, 734–35 (1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976), and *United States v. King,* 552 F.2d 833, 844–46 (1976). At least the trial judge was entitled so to find.

(4) *Admission of Frank Mangan's tax returns to show acquisition of wealth.*

 The Government was permitted to introduce testimony through a revenue agent that an analysis of Frank and Jeanne Mangan's 1972 and 1973 tax returns showed that during 1972 he made purchases of securities which required an investment of $12,123.17, in addition to gains on sales during the period. Coupling this with evidence that Frank and Jeanne reported gross income of some $20,650 and taxable income of approximately $10,730 in 1971, and gross income of $18,600 and no taxable income in 1972, the Government was allowed to argue that the 1972 stock investments were financed through Frank's share of the unlawfully obtained tax refunds. Frank objects that there was no sufficient showing that he did not have other available funds.

Rule 401 of the Federal Rules of Evidence defines relevant evidence as evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Protection against undue liberality in the admission of evidence passing this rather low test is furnished by Rule 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Administration of both rules is left primarily to the sound discretion of the trial judge. *Hamling v. United States,* 418 U.S. 87, 124–25, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Corr,* 543 F.2d 1042, 1051 (2 Cir. 1976).

Recognizing that "[e]vidence of *sudden* acquisition of large amounts of money is . . . admissible to prove criminal misconduct when pecuniary gain . . . is the basic motive," (emphasis in original), *United States v. Tramunti,* 513 F.2d 1087, 1105 (2 Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), and that *United States v. Falley,* 489 F.2d 33, 39 (2 Cir. 1973), held that "the establishment of a defendant's opening net worth is not necessary to permit admission of such evidence," Frank Mangan contends that the Government laid no sufficient predicate to show that the amounts used for stock purchases were either suddenly acquired or large. We doubt whether we would have allowed the evidence to be received, especially in view of the rather small amount involved and evidence in the record of a pattern of rather substantial purchases since 1970, and the trial judge's action in doing so indeed goes to the verge. As against this trial counsel fully developed Frank's explanation on cross-examination of the revenue agent and, in light of the other evidence against Frank, we cannot believe that receipt of this evidence had any effect on the verdict.[15]

---

**14.** It should be made clear that we are not relying on Rule 804(b)(3) as the relevant hearsay exception—an office which was here served by Rule 803(3) and which Rule 804(b)(3) could not perform because Kevin, although in fact "unavailable" was not so within the definition of Rule 804(a)(1) which requires a ruling from the court that the desired testimony is privileged. We cite it only for its recognition that a statement exposing a declarant to criminal liability helps to justify a finding of veracity. See also *United States v. Harris,* 403 U.S. 573, 595, 91 S.Ct. 2075, 29 L.Ed. 723 (1971) (Harlan, J., dissenting); McCormick, Evidence § 278 (2d ed. 1972).

**15.** We again express our wonderment, as we have so often done, why the Government chooses to imperil a strong case by introducing a line of evidence having scant probative value but bound to constitute a point on appeal. Cf. *United States v. Leonard,* 524 F.2d 1076, 1084 (1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976).

(5) *Alleged impairment of Kevin Mangan's right of cross-examination of fingerprint expert.*

The point most strongly pressed by Kevin Mangan is that he was denied effective cross-examination with respect to the testimony of Zachary Levin, a fingerprint expert in the New York City Police Department, that Kevin's fingerprints appeared on two of the tax refund checks. A further statement of facts is essential.

The Government sought to show that Kevin's fingerprints appeared on four relevant documents: a corporate resolution of McCarthy Enterprises, Inc.; the fictitious return of John McCarthy, 230 W. 76th Street, New York City (GX 2); a refund check to the same John McCarthy (GX 27); and a refund check to another John McCarthy, 303 W. 80th St., New York City (GX 24). Testimony with respect to the resolution was given by an FBI fingerprint expert, who had prepared a "blow-up" of the latent print on it for comparison with Kevin's fingerprint. Defense counsel conceded the point during the expert's direct examination. Levin, who began his testimony on June 15, had likewise prepared a "blow-up" of the latent prints on the fictitious tax return; defense counsel also conceded that these as well as palmprints on the return were Kevin's. These damaging concessions were sought to be explained—we suspect not very convincingly—by developing on cross-examination of Bertsch and on direct examination of Ray Nazarro that Kevin kept on hand a considerable stock of corporate and tax forms. The suggestion was that Kevin's fingerprints and palmprints might have innocently found their way to the corporate resolution and income tax forms and that these had then been appropriated and filled out by Bertsch. Since no such explanation was possible with respect to the refund checks, defense counsel mounted a spirited cross-examination of Officer Levin in regard to this, of which more below.

Kevin Mangan's counsel had been informed on May 31, the first day of the trial, that Levin had identified the prints on the refund checks and was furnished photographs the next day. Before that the court had appointed a fingerprint expert to assist the defense at Government expense. On June 14 Kevin's counsel advised the judge that he had learned from Levin that the latter had only one blow-up and complained that he could not cross-examine without blow-ups. The Assistant United States Attorney responded that defense counsel knew there would be only one blow-up and that the Government would have produced the additional enlargements if it had been "apprised of the need a few weeks ago." [16] Defense counsel contended that he was unaware of the amount of fingerprint evidence to be produced or of the dearth of blow-ups. The judge responded:

> All right. Let's hear from the witness and if it develops that his testimony is inadequate and that your cross-examination is inadequate because we don't have charts then we will consider whether or not he will be required to produce charts, blowups.

Kevin's counsel brought out that Levin had made no notes of his examination of the disputed fingerprints and filed no report on the points of similarity. Admitting that one dissimilarity would destroy the identification, Levin said he had seen none but repeatedly asserted that he was not prepared to answer detailed questions "at this time." When defense counsel offered the use of a magnifying glass, Levin declined on the ground that he could function only with a "special type magnifying glass" and the ideal lighting which he had at his office. An attempt to have the jury itself compare the disputed and exemplar fingerprints apparently failed.

After a luncheon recess the court denied a motion to strike Levin's testimony. On redirect the prosecutor brought out that at his request Levin had gone back to his office during the lunch hour, had again examined the disputed prints with his special magnifying glass, and, unsurprisingly,

---

**16.** We were told at argument that a blow-up can be produced within several hours.

had confirmed his original conclusions. On recross examination defense counsel asked whether Levin had brought his special magnifying glass back with him; Levin answered in the negative. Defense counsel did not ask that he be instructed to get it. Levin also admitted that he had made no notes of his lunchtime examination and repeated that he was not prepared to give a detailed analysis of the points of comparison. He said he had looked for the alleged dissimilarities which counsel had called to his attention and noticed none; more detailed examination with respect to particular dissimilarities proved unproductive.

Kevin invokes both the confrontation clause of the Sixth Amendment and Federal Rule of Evidence 705, which provides:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

The chief object of the Rule, as disclosed by the Advisory Committee's Note, was to eliminate the need for the lengthy hypothetical question. The Note sheds no light on the scope of the second sentence, and there was no Congressional commentary.

While counsel's cross-examination very likely discredited Levin's expert testimony as much as could practically be expected, we cannot rule out the slim possibility of the achievement of a cross-examiner's dream—demolishing an expert out of his own mouth. We do not much like the way in which this matter was handled. We

have previously put the Government on notice of its serious obligation not to obstruct a criminal defendant's cross-examination of expert testimony, *United States v. Kelly,* 420 F.2d 26 (2 Cir. 1969); *United States v. Dioguardi,* 428 F.2d 1033, 1037–38 (2 Cir.), *cert. denied,* 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970). It would have been such a simple matter, see fn. 16 *supra,* for the Government voluntarily to have provided the additional blow-ups when defense counsel first raised the issue or for the judge to have ordered the prosecutor to do so. It would have been equally simple for the prosecutor, when he requested Levin to re-examine the prints, to tell the expert to engage in whatever preparation was needed to enable him to make more detailed responses and to bring his magnifying glass back with him, so that he could at least try it out under whatever special lighting the court could provide.[17] Still this was a long way from the "trial by ambush" for which we reversed in *United States v. Kelly, supra,* 420 F.2d at 29. Kevin's counsel had photographs of the disputed fingerprints two weeks before Levin testified; we have been pointed to no reason why he could not have made satisfactory blow-ups of the photographs to use on cross-examination. Indeed, defendant may have been able to do this after the Government had refused to make the blow-ups and the judge had refused to order this for the time being, see fn. 16 *supra.* We see nothing to indicate that the court would have been unwilling to postpone completion of Levin's cross-examination for a brief period if this were needed. Our impression is that defense counsel made what was probably a wise tactical choice not to press too hard lest his argu-

---

17. The Government's argument that failure to provide the blow-ups did not impinge upon defendant's right to confrontation because it was the expert testimony, and not the fingerprints, which was the evidence subject to cross-examination begs the question. If, as Kevin argued, absence of the blow-ups had stultified his cross-examination of Levin, the confrontation right afforded would be a hollow one. Neither do we think *United States v. Duffy,* 454 F.2d 809 (5 Cir. 1972) (Wisdom, J.), and *United States v. Sewar,* 468 F.2d 236 (9 Cir. 1972), *cert. denied,* 410 U.S. 916, 93 S.Ct.

972, 35 L.Ed.2d 278 (1973), cited by the Government, to be of assistance to it. In the former case, the court found no denial of cross-examination where a police officer and an FBI agent testified about the laundry markings on a shirt which was not produced. In the latter, a lab technician was allowed to testify about tests on a blood sample although the sample had been destroyed. In neither case was there discussion whether cross-examination of the witness was ineffective in the absence of the missing evidence.

48

ment to the jury about Levin's obstinacy and his future point on this appeal might be impaired. Moreover, if the defense had thought there was a real case to be made against Levin's testimony, it would have called the expert who had been appointed for it. Particularly in light of the trial judge's appraisal, which we share, that cross-examination was quite effective, the defense's failure to call its expert is critical. In short we are not sufficiently convinced that Kevin was deprived of any substantial rights to induce us to reverse a conviction founded on an abundance of convincing circumstantial evidence as well as Bertsch's testimony.

(6) *Handwriting testimony with respect to Kevin.*

 An important element of the Government's proof against Kevin was the testimony of Douglas Cromwell, a handwriting expert with the United States Bureau of Alcohol, Tobacco and Firearms, that Kevin's handwriting appeared on various bank opening account cards and deposit and withdrawal tickets. The exemplars used by Cromwell as a basis for this testimony consisted of handwriting on checks of American Banquet Corporation, one of Kevin's enterprises, with which Bertsch had been associated, which Bertsch identified as Kevin's. Kevin claimed that the checks had been stolen by two former business associates in cooperation with state prosecutors. After an extensive suppression hearing Judge Stewart found that any illegal taking of the checks was the work of the individuals alone. Kevin attacks this finding but it surely was not clearly erroneous. The argument therefore falls. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. McGuire,* 381 F.2d 306, 313–14 n. 5 (2 Cir.

1967), *cert. denied,* 389 U.S. 1053, 88 S.Ct. 800, 19 L.Ed.2d 348 (1968); *United States v. Capra,* 501 F.2d 267, 272–73 n. 4 (2 Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975).

In cross-examining Cromwell, Kevin's counsel called his attention to several charts extracted from a learned treatise in an endeavor to show that the characteristics of handwriting which Cromwell had regarded as individual and identifying were generally recognized common characteristics. When counsel offered the charts in evidence, the judge rejected them, relying on the last sentence of "Learned Treatises" exception to the hearsay rule in Rule 803(18) of the Federal Rules of Evidence.[18] It is not altogether clear to us how a chart can "be read into evidence," and good sense would seem to favor its admission into evidence, at least in a case where, as here, its significance had been fully explored with the expert.[19] Still the trial judge permitted the jury to view the charts as they were being discussed, and we do not see how we can fault him for following the black letter as closely as he could. Compare *O'Gee v. Dobbs Houses, Inc.,* 570 F.2d 1084, 1088–1089, 1091 n. 1 (2 Cir. 1978). If the jury had wanted the charts during its deliberations, it could have asked for a reading of the relevant portion of Cromwell's testimony including their display. Other objections with regard to the handling of the handwriting testimony do not warrant discussion.

(7) *The mail fraud counts.*

 There is no merit in appellants' contention that there was insufficient evidence of use of the mails. While there was no proof that the fictitious returns were mailed, this is not fatal if there was sufficient evidence that the refund checks were,

18. Rule 803(18) reads:
 To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert

testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

19. The Advisory Committee's Note shows that the purpose of the last sentence was to prevent a jury from rifling through a learned treatise and drawing improper inferences from technical language it might not be able properly to understand without expert guidance.

since the fictitious returns "caused" these mailings and the obtaining of the checks was the very goal of the scheme. See *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954); contrast *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 89 L.Ed. 88 (1944); *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); and *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), where it was held that the object of the scheme had been attained prior or was insufficiently related to any use of the mails. The Government's proof included disbursement sheets showing the mailing of the refund checks and a stipulation that the custom and practice of the disbursing office was to mail the checks on or about the date when they were drawn. Beyond this was the evidence warranting the jury in finding that the checks had been received at the various addresses; there is no suggestion that such checks are ever transmitted otherwise than by mail.[20]

▪ Defendants' final point is based on *United States v. Henderson,* 386 F.Supp. 1048 (S.D.N.Y.1974). Judge Weinfeld there dismissed mail fraud counts of an indictment where the scheme as charged in other counts was to defraud the United States by evading and defeating the payment of income taxes in violation of I.R.C. § 7201 and to file false and fraudulent income tax returns in violation of I.R.C. § 7206(1). He held that, in light of the history of the mail fraud statute, it was not intended to include cases where a taxpayer violated provisions of I.R.C. chapter 75 with respect to his own tax liability. We also have expressed misgivings over the Government's use of the mail fraud statute as a basis for additional counts in an indictment the gravamen of which was the violation of other federal criminal statutes, *United States v. Dixon,* 536 F.2d 1388, 1398–1401 (2 Cir. 1976).

However, this case differs from *Henderson* in that the fraud here did not relate to defendants' own tax liabilities. The scheme here was to swindle the Government by causing it to pay out money to persons having no entitlement to it, in a fashion similar to those embraced within the historic purpose of the mail fraud statute, see *United States v. Maze, supra,* 414 U.S. at 405–06, 94 S.Ct. 643 (Chief Justice Burger, dissenting). Decisions cited in fn. 18 of Judge Weinfeld's *Henderson* opinion, *supra,* 386 F.Supp. at 1053, have upheld applications of the mail fraud statute when public bodies have been led through use of the mails to lose property by fraudulent schemes. It is of no moment here that the means used were fictitious tax returns rather than fraudulent statements of other sorts. We can therefore leave the question whether this court would follow *Henderson* on its facts to another day.[21]

The judgments of conviction are affirmed.

---

20. Appellants also attacked the validity of the mail fraud counts of the indictments on the ground that inadequate evidence of mailing had been presented to the grand jury. The district judge inspected the minutes and found the evidence was adequate. We have not reviewed this in light of the ruling in *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974), that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence . . ." There is nothing to indicate that the grand jury was misled, as in *United States v. Estepa,* 471 F.2d 1132 (2 Cir. 1972). See also *United States v. Marchand, supra,* 564 F.2d at 1001 n. 29.

21. The Ninth Circuit has expressly declined to do so. *United States v. Miller,* 545 F.2d 1204 (9 Cir. 1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977). See also *United States v. Brewer,* 528 F.2d 492 (4 Cir. 1975); *United States v. Mirabile,* 503 F.2d 1065, 1066–67 (8 Cir. 1974), *cert. denied,* 420 U.S. 973, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *United States v. Flaxman,* 495 F.2d 344, 348–49 (7 Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974); *United States v. Melvin,* 544 F.2d 767 (5 Cir.), *cert. denied,* 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977).