David "Birny" BIRNBAUM, Appellant,

v.

ALLIANCE OF AMERICAN
INSURERS, et al.,
Appellees.

David "Birny" Birnbaum; John Cornyn, Attorney General of Texas; and Elton Bomer, Commissioner of Texas Department of Insurance, Appellants,

v.

National Association of Independent
Insurers, et al., Appellees.

Nos. 03–97–00660–CV, 03–98–00208–CV.

Court of Appeals of Texas,
Austin.

May 20, 1999.

Rehearing Overruled July 15, 1999.

D.J. Powers, Law Offices of D.J. Powers, Austin, for Appellant.

John Cornyn, Attorney General, Austin, pro se.

Linda Ibach Shaunessy, Assistant Attorney General, Austin, for Attorney General in cause no. 03-98-00208-CV.

Dudley D. McCalla, Heath, Davis & McCalla, P.C., Austin, for National Association of Independant Insurers; Alliance of American Insurers, United Services P.C. Automobile Association, USAA Casualty Ins. Co. and USAA County Mutual Ins. Co.

Daniel Read Richards, Bernsen, Jamail & Goodson, L.L.P., Austin, for Appellee Ohio Casualty Ins. Co., West American Ins. Co., American Fire and Casualty Co. and Ohio Security L.L.P. Ins. Co.

Fred B. Werkenthin, Leonard H. Dougal, Small, Craig & Werkenthin, P.C., Austin, for Appellee Texas Farmers Ins. Co., Mid-century Ins. Co. of Tx. and Farmers Texas County Mutual Ins. Co.

Before Justices KIDD, B.A. SMITH and POWERS.*

JOHN E. POWERS, Justice.

In the first cause of a consolidated appeal, David "Birny" Birnbaum appeals from an order granting a temporary injunction on the application of several automobile insurance companies and trade associations ("appellees").[1] In the second cause, Birnbaum, joined by Attorney General and Elton Bomer,[2] Commissioner of the Texas Department of Insurance (the "Department"), appeals from a summary judgment granting a permanent injunction as requested by appellees. Both the temporary injunction and the permanent injunction prohibit the Department from releasing information to Birnbaum in response to his open records request. We will reverse the summary judgment and dissolve the permanent injunction; we will modify the temporary injunction order, affirming it as modified.

## THE CONTROVERSY

Texas law requires that motor vehicle operators establish their financial responsibility. *See* Tex. Transp. Code Ann. § 601.051 (West 1999). Compliance typically involves the purchase of an automobile liability-insurance policy. *See id.* § 601.071–.088; *Office of Pub. Ins. Counsel v. Texas Auto. Ins. Plan*, 860 S.W.2d 231, 233 (Tex.App.—Austin 1993, writ de-

nied). Insurers are prohibited to engage in unfair discrimination by refusing to insure, refusing to continue to insure, limiting the amount, extent, or kind of coverage available, or charging an individual a different rate for the same coverage because of the individual's age, gender, marital status, or *geographic location*. *See* Tex. Ins. Code Ann. art. 21.21–6, §§ 1, 3(b) (West Supp.1999) (emphasis added).

In order to allocate high-risk drivers among insurers, the 73d Legislature established the Texas Automobile Insurance Plan Association ("TAIPA"). *See* Tex. Ins. Code Ann. art. 21.81, § 2(a); *see also Office of Pub. Ins. Counsel*, 860 S.W.2d at 233 n. 2. TAIPA is a nonprofit corporation with members, all of which are authorized automobile insurers. *See* Tex. Ins.Code Ann. art. 21.81, § 2(a).

The governing committee of TAIPA is responsible for making, amending, and administering a "plan of operation," subject to the approval of the Commissioner of Insurance (the "Commissioner"). *See id.* § 3(a), (c). The purpose of the plan is to provide automobile liability-insurance coverage for drivers who are unable to obtain such coverage in the open or voluntary market. *See id.* § 1(4). The plan adopted by TAIPA contains an incentive program to encourage TAIPA members to write insurance on a voluntary basis for consumers in "underserved"[3] geographic areas,

---

* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. State Farm Mutual Automobile Insurance Company, State Farm Fire and Casualty Company, and State Farm County Mutual Insurance Company of Texas are designated as "other parties" in the first cause and as "appellees" in the second cause. All other insurance companies and trade associations designated as "appellees" in the first cause are also "appellees" in the second cause. These entities include National Association of Independent Insurers, Alliance of American Insurers, United Services Automobile Association, USAA Casualty Insurance Company, USAA County Mutual Insurance Company; Texas

Farmers Insurance Company, American Fire and Casualty Company, Farmers Texas County Mutual Insurance Company, Mid–Century Insurance Company of Texas, Ohio Casualty Insurance Company, Ohio Security Insurance Company, and Western American Insurance Company. To simplify the text, we will refer to all insurers and trade associations involved in the present consolidated appeal as "appellees."

2. We shall refer collectively to the Attorney General and the Commissioner as "the State officials."

3. Under the authority and requirements of Insurance Code article 21.81, section 3(e), the Department has determined and designated

reducing thereby the need for TAIPA to assign high-risk drivers to specific insurers.[4] *See id.* § 3(e). An insurer who voluntarily sells automobile insurance in underserved areas is eligible for credits against such insurer's quota of TAIPA assignments. The TAIPA plan of operation establishes the method for calculating basic quotas and credit-adjusted quotas.[5] *See* 20 Tex. Reg. 334 (1995).

The Texas Private Passenger Automobile Statistical Plan ("Statistical Plan"), promulgated by the Department, requires the reporting of certain information necessary for the calculation of quotas and credits. Four reports are required to be submitted to the Department by all companies "writing direct private passenger automobile business in Texas." The four reports are: the Annual Aggregate Experience Report, Annual Reconciliation Report, Quarterly Market Report, and Quarterly Detailed Experience Report.

Birnbaum filed with the Department on October 29, 1996, an open-records request under the Texas Public Information Act seeking information in the Quarterly Market Reports for the first and second quarters of 1996. *See* Tex. Gov't Code Ann. § 552.021 (West 1994 & Supp.1999). The Quarterly Market Reports list by ZIP Code [6] information concerning written premiums,[7] policy and membership fees, number of vehicles on policies at the end of the previous quarter, number of vehicles on policies at the end of the current quarter, and changes in the number of vehicles insured [8] for bodily injury liability and collision coverages. According to Department rules, information related to "the number of average vehicles on policies in force by ZIP Code" shall be available upon request in order that TAIPA, insurers, and the public may "make the necessary credit calculations and allow all interested parties to monitor which ZIP Code may be underserved in the future." 28 Tex. Admin. Code § 5.206(h) (1998).

Pursuant to Government Code section 552.301, the Department requested from

by rule underserved geographic areas. *See* 28 Tex. Admin. Code Ann. § 5.206(a)-(e) (1998). Specific ZIP Codes are designated "underserved" based on "the availability of insurance, the number of uninsured drivers, the number of drivers insured through [TAIPA], and any other relevant factor." Tex. Ins.Code Ann. art. 21.81, § 3(e) (West Supp.1999). The formula for analyzing availability is "the share of average vehicles on policies in force in assigned risk and non-standard markets as a percentage of total average vehicles on policies in force by ZIP Code." 28 Tex. Admin. Code § 5.206(g) (1998).

4. The system for compelling insurance carriers to provide liability coverage to high-risk drivers is known as the "assigned risk plan." TAIPA administers the assigned risk plan. *See Office of Pub. Ins. Counsel v. Texas Auto. Ins. Plan,* 860 S.W.2d at 233 (Tex.App.—Austin 1993, writ denied).

5. The administrative rule designating "underserved" ZIP Codes divides them into five categories. *See* 28 Tex. Admin. Code § 5.206(a)-(e) (1998). The TAIPA plan of operation specifies that the category number refers to the number of credits awarded an insurer for each eligible insured vehicle in the ZIP Code. For example, no credits are awarded for eligible insured vehicles in a Category 0 ZIP Code

while four credits are awarded for an eligible insured vehicle in a Category 4 ZIP Code. Furthermore, only vehicles insured at rates at or below the TAIPA rate set by the Commissioner are eligible for both basic and quota credits. As stated in the Texas Register, "The premise is that consumers do not benefit from a voluntary writing at rates above the TAIPA rate, so credits should not be earned for writing at non-standard rates." 20 Tex. Reg. 334 (1995).

6. The Statistical Plan states, "For the Quarterly Market Report, the location of vehicles is defined as the *garage address* of the vehicle and not the mailing address of the insured" (emphasis in original).

7. The Statistical Plan defines "written premium" as "total gross premium *excluding* policy and membership fees and less return premium and premium on policies not taken" (emphasis in original).

8. A Quarterly Market Report must account for changes in the number of vehicles insured by listing four elements: vehicles added in the quarter, vehicles canceled or non-renewed at the insurer's initiative, vehicles canceled for non-payment of premium, and vehicles canceled at the insured's initiative.

the Attorney General a decision on whether the reports fell within any of the several exceptions to required disclosure. *See* Tex. Gov't Code Ann. §§ 552.301, .101–.123 (West 1994 & Supp.1999). The Attorney General decided initially that the reports of some of the companies were excepted from mandatory disclosure as either trade secrets or as commercial or financial information. *See* Tex. Att'y Gen. ORD–0301 (1997); *see also* Tex. Gov't Code Ann. § 552.110 (West 1994). The Department requested that the Attorney General reconsider his decision. The Attorney General held again that the requested information was excepted from disclosure, but because Birnbaum alleged that the Department had previously released similar information, the Attorney General instructed the Department to decide whether to disclose the reports voluntarily. *See* Tex. Gov't Code Ann. § 552.007 (West Supp.1999).

The Department decided to release the information and appellees sued to enjoin the disclosure. After a pre-trial hearing, the district court determined the reports were probably protected from mandatory public disclosure under exceptions in the Texas Public Information Act that pertain to trade secrets, confidential commercial or financial information, and information "contained in or relating to examination, operating, or condition reports prepared by or for an agency responsible for the regulation or supervision of financial institutions or securities, or both." *See* Tex. Gov't Code Ann. §§ 552.110, .112 (West 1994). Finding that appellees would sustain immediate and irreparable harm if the reports were released to the public, the district court enjoined the Department pendente lite from releasing the reports. Birnbaum appealed to this Court.

While Birnbaum's appeal from the temporary injunction was pending, the district court decided the merits of the case by ruling on appellees' motion for summary judgment. The district court determined the Quarterly Market Reports were excepted from mandatory public disclosure as information relating to the regulation of financial institutions or securities. *See* Tex. Gov't Code Ann. § 552.112(a). A partial summary judgment was granted on this basis alone and the Department was permanently enjoined from releasing the reports. Birnbaum's motion to sever the partial summary judgment and make it the subject of a separate action was granted. Birnbaum and the State officials then appealed from the summary judgment order.

## DISCUSSION AND HOLDINGS

### *Permanent Injunction*

The trial court ruled summarily that the Quarterly Market Reports are excepted from mandatory disclosure, as a matter of law, pursuant to section 552.112 of the Texas Public Information Act, and enjoined their release to Birnbaum.

■ Section 552.112 provides an exception for "information contained in or relating to examination, operating or condition reports prepared by or for an agency responsible for the regulation or supervision of financial institutions or securities, or both." Tex. Gov't Code Ann. § 552.112. Appellants Birnbaum and the State officials contend the exception does not apply to the Quarterly Market Reports. Birnbaum argues that the reports cannot be "operating or condition reports" because they do not provide a complete picture of the financial status or solvency of the affected insurance companies. The State officials assert that there is at least a factual dispute, precluding summary judgment, over whether the Quarterly Market Reports are "operating or condition reports." In addition, Birnbaum disputes that the insurance companies are "financial institutions" within the meaning of the exception.[9] The State officials contend in addi-

---

**9.** The State officials do not contest that insurers are "financial institutions" for the pur-  poses of section 552.112.

tion that even if the Quarterly Market Reports come within section 552.112, the Department may nevertheless elect to release the information at its discretion.

Whether the Quarterly Market Reports are "operating or condition reports" of a "financial institution," within the meaning of section 552.112, is a matter of statutory construction. The term "financial institution" is not statutorily defined for purposes of section 552.112. Words that are not defined in a statute are generally given their ordinary meaning. *See* Tex. Gov't Code Ann. § 312.002(a) (West 1998); *Tijerina v. City of Tyler*, 846 S.W.2d 825, 827 (Tex.1992).

Birnbaum argues that the legislature ordinarily excludes insurers when defining the term "financial institution." This conclusion is based on a survey of fifteen Texas statutes that exclude insurers from the term "financial institutions." [10] Birnbaum concedes that there are two "aberrational" statutes that do include insurance companies within the definition of "financial institutions," [11] but attempts to distinguish these statutes on the ground that the definition would clearly exclude *automobile* insurers even if other insurers were included.

Appellees rejoin that insurance companies are inherently "financial institutions" by virtue of their services, which consist of accepting premiums, investing the funds, and paying out money to customers in the form of claim payments. Appellees also provide two dictionary definitions that include insurance companies among examples of "financial institutions." [12] On these grounds, appellees assert they have established that the ordinary meaning of "financial institutions" includes insurance companies.

The reasons marshaled by the parties prove only that the term "financial institution" admits of more than one ordinary meaning. The statutes cited by Birnbaum do not control in this instance. Each such statute defines "financial institution" in a statutory context that does *not* logically pertain to insurance companies. [13]

Nor are we persuaded by appellees' dictionary definitions. At least one of the definitions reflects merely the existence of a federal statutory definition of "financial institution." *See Black's Law Dictionary* 630 (6th ed.1990) (citing 31 U.S.C.A § 5312; Uniform Probate Code § 6–101(3)). Moreover, two reputable dictionaries contain no definition of "financial institution," suggesting that the expression, as such, has no certain meaning in ordinary usage. *See The American Heritage Dictionary of the English Language* (William Morris ed., 1973); *The Random House College Dictionary* (revised ed., 1984).

We conclude that the meaning of the term "financial institution," as used in the statute, is uncertain as to whether it was intended to include insurance companies. In deciding the issue, we must therefore give the statute a reasonable construction that is consistent with the whole of the statute and its purpose and objective. *See*

---

10. *See* Tex. Prop.Code. Ann. §§ 141.002(7), 162.005(5) (West Supp.1999); Tex. Gov't Code Ann. § 481.401(2) (West 1998); Tex. Rev.Civ. Stat. Ann. art. 360, § 1(2) (West Supp.1998); Tex. Fin.Code. Ann. §§ 15.204(c), 31.002(a)(25), 59.301(7), 91.002(14), and 302.105(b)(1) (West 1998); Tex. Bus. & Com.Code Ann. § 26.02(a)(1) (West.Supp.1999); Tex. Civ. Prac. & Rem. Code Ann. § 30.007(a)(2) (West 1997); Tex. Ins.Code Ann. art. 21.57(a)(2) (West Supp. 1999); Tex. Prob.Code Ann. § § 241(b), 436(3) (West Supp.1999).

11. Tex. Penal Code Ann. § 32.01(1) (West 1994); Tex.Rev.Civ. Stat. Ann. art. 1528g, § 1(3) (West 1997).

12. *See Webster's Third New International Dictionary* 851 (Philip B. Gove ed., 1981); *Black's Law Dictionary* 630 (6th ed.1990).

13. *See, e.g.,* Tex. Fin.Code Ann. §§ 15.204, 59.202 & 59.301 (West 1998) (relating to regulation of banking firms); Tex. Gov't Code Ann. § 481.401 (West 1998) (enacting program to secure loans to business and nonprofit organizations).

*Ex parte Pruitt,* 551 S.W.2d 706, 709 (Tex. 1977); *City of Mason v. West Texas Utils. Co.,* 150 Tex. 18, 237 S.W.2d 273, 278 (1951); *Fleming Foods v. Sharp,* 951 S.W.2d 278, 281 (Tex.App.—Austin 1997, pet. granted).

We find at the beginning of the statute a broad statement of general legislative intent. Section 552.001(a) articulates the policy and purpose of the Texas Public Information Act:

> [I]t is the policy of this state that each person is entitled, unless otherwise *expressly provided* by law, at all times to complete information about the affairs of government and the official acts of public officials and employees.... The people insist on remaining informed so that they may retain control over the instruments they have created. The provisions of this chapter shall be liberally construed to implement this policy.

Tex. Gov't Code Ann. § 552.001(a) (West 1994) (emphasis added). In addition to this statement of a general policy, the legislature indicated a wish that the statute "be liberally construed in favor of granting a request for information." *Id.* § 552.001(b).

In light of the clearly expressed general purpose of ensuring that the public retains effective control of government, appellees bear a significant burden of persuasion that the legislature intended an expansive interpretation of a statutory exception that operates against the general purpose of the statute.

■■■ Appellees assert that the long-standing position of the Attorney General—that insurance companies are "financial institutions" within the meaning of section 552.112—must be presumed to have been understood by the legislature and implicitly adopted each time the statute was reenacted. We disagree. The well-settled rule is that a legislature presumably adopts judicial interpretations of an act when a statute is reenacted without material change. *See Coastal Indus. Water Auth. v. Trinity Portland Cement Div., Gen. Portland Cement Co.,* 563 S.W.2d 916, 918 (Tex.1978). Attorney General opinions are not judicial interpretations; they are not controlling on the courts. *See Commissioners Court v. Agan,* 940 S.W.2d 77, 82 (Tex.1997); *City of San Antonio v. Texas Att'y Gen.,* 851 S.W.2d 946, 950 (Tex.App.—Austin 1993, writ denied) ("The attorney general's opinions ... are purely ministerial and advisory."). Nor are they controlling on the legislature. *See* 2B Sutherland, *Statutory Construction* § 49.09, at 69 (5th ed. 1992) ("When Congress reenacts an earlier statute, the presumption is that it knows and approves prior *judicial* constructions of that act by *state* courts.") (emphasis added). Furthermore, nothing suggests that the legislature was aware of the Attorney General's interpretation of "financial institution" when it reenacted the statute. "[Re]enactment of [a statute] to which an administrative interpretation or regulation pertains should not make the administrative ruling automatically binding as law *without evidence* that clearly manifests such a purpose." *Id.* at 69–70 (emphasis added).[14]

The Attorney General's position that the term "financial institutions" includes insurance companies was based in part on an

---

**14.** The case of *Rainbow Group, Ltd. v. Texas Employment Commission,* 897 S.W.2d 946 (Tex.App.—Austin 1995, writ denied), is consistent with this general rule. In *Rainbow Group,* we assumed that the legislature adopted an Attorney General interpretation when it recodified a Texas statute that had been construed in an Attorney General Open Records Decision. *See id.* at 949. In that case, there was specific evidence that the legislature *had* taken notice of the Attorney Gen-

eral opinion interpreting the statute when the legislature modified the statute using language from the opinion. *See id.* In the case at bar, by contrast, the language of the state exemption is taken verbatim from the language of an exemption in a federal statute, and there is no evidence that the legislature incorporated Attorney General opinions into its intended meaning of the term "financial institution."

analogy to an unrelated statute.[15] The Attorney General also relied on the definition provided in *Webster's Third International Dictionary*, which we have rejected as authoritative in this context. Finally, the Attorney General looked to the legislative history of the Act, and found the testimony of an insurance commissioner wherein he *requested* that an exception be made for insurance companies. Nothing indicates that the legislature intended any particular response to that request in the language that body chose to place in the statute. The insurance industry's position on how the statute should be interpreted is therefore not persuasive. We decline to follow the Attorney General's interpretation.

■ With nothing definite before us regarding the legislature's intention, we look for guidance to the analogous federal Freedom of Information Act. Section 552.112 was modeled after exception eight of the Freedom of Information Act. *See* 5 U.S.C. § 552(b)(8) (1996). Federal decisions construing exceptions to the Freedom of Information Act are instructive in our interpretation of the Texas Public Information Act. *See A & T Consultants, Inc. v. Sharp*, 904 S.W.2d 668, 676 (Tex. 1995); *City of Garland v. Dallas Morning News*, 969 S.W.2d 548, 557 (Tex.App.—Dallas 1998, writs granted).

In an opinion interpreting the federal statute, the Court of Appeals for the District of Columbia noted the sparse legislative history that accompanied exception eight. *See Consumers Union of United States, Inc. v. Heimann*, 589 F.2d 531, 539

(D.C.Cir.1978). However, the court was able to discern two reasons for the exception. The exception was intended primarily "to insure the security and integrity of financial institutions, for the sensitive details collected by Government agencies which regulate these institutions could, if indiscriminately disclosed, cause great harm." *Id.* at 534 n. 10 (quoting U.S.Code Cong. & Admin. News 1966, pp. 2418, 2428). Exception eight was designed also to encourage compliance with government regulations, by ensuring the confidentiality of information provided by financial institutions pursuant to those regulations. *See id.*

Neither purpose is furthered in this instance by protecting Quarterly Market Reports from disclosure. First, the harm that appellees fear is competition, not harm that involves directly the security of the institution itself or the industry.[16] There is no showing or contention that release of the Quarterly Market Reports is likely to injure the security or integrity of insurance companies. Second, the objective of encouraging compliance with government regulations is for the benefit of the government, not the regulated institutions. Because of the exception, government may withhold from mandatory disclosure information supplied by private entities on the ground that disclosure might jeopardize government's ability to collect such information in the future. But here the State officials *wish to disclose* the reports. They apparently have determined that the public interest in disclosure outweighs any applicable regulatory interest in assuring that regulated

---

**15.** *See* Tex. Att'y Gen. ORD–158 (1977) (citing Tex. Bus.Code Art. 1528(g)).

**16.** While the court in *Consumers Union* seemed to acknowledge that harm to financial institutions could encompass competitive harm from other banks, *see Consumers Union of United States, Inc. v. Heimann*, 589 F.2d 531, 540 (D.C.Cir.1978), we believe the exception for trade secrets is more pointedly designed to protect against such harm. *See* Tex. Gov't Code Ann. § 552.110 (West 1994). Historically, federal courts have been willing to

limit the scope of the Freedom of Information Act. Texas courts have declined to follow suit. *See Industrial Found. of the South, Inc. v. Texas Indus. Accident Bd.*, 540 S.W.2d 668, 682 (Tex.1976) ("We decline to adopt an interpretation which would allow the court in its discretion to deny disclosure even though there is no specific exemption provided."); *Texas Dep't of Pub. Safety v. Gilbreath*, 842 S.W.2d 408, 413 (Tex.App.—Austin 1992, no writ).

insurers comply with reporting requirements.

Finally, section 552.112 is a permissive exception only. Even if the exception applies to the Quarterly Market Reports, the State officials may reject the exception and disclose the information to the public. This power is given in section 552.007, which states as follows: "This chapter does not prohibit a governmental body ... from voluntarily making part or all of its information available to the public, unless disclosure is expressly prohibited by law or the information is confidential under law." Tex. Gov't Code. Ann. § 552.007(a) (West Supp.1999). A government agency may therefore release any information that is not expressly prohibited from release on the grounds indicated. *See id.* §§ 552.110, .112; *Industrial Found. of the South, Inc. v. Texas Industrial Accident Board,* 540 S.W.2d 668, 682–83 (Tex.1976).

Appellees argue that a better reading of section 552.007 would allow the government to disclose its own documents, but not documents in which there is a third-party property or privacy interest. Appellees advocate a distinction not suggested by the language of the statute. Some kinds of information given to a State agency will undoubtedly be confidential. For example, if the appellees' filings amounted to a trade secret or confidential or privileged information under section 552.110, they would be confidential under law and therefore could not be disclosed under section 552.007. But we find no authority for the proposition that section 552.112 *itself* creates a class of information that is confidential under law because it was furnished to the State by private entities. The fact that information is excepted from mandatory disclosure does not necessarily render it confidential. When the legislature has intended to make information confidential, it has not hesitated to so

provide in express terms. *See, e.g.,* Tex. Ins.Code Ann. art. 1.24D (making explicit the confidentiality of underwriting guidelines and stating that a violation of this section is a violation of the open-records law); Tex. Gov't Code Ann. § 552.113(a), (c) (West Supp.1999) (excepting geological or geophysical information that is defined as confidential); Tex. Health & Safety Code Ann. § 82.009 (West 1992) (ensuring confidentiality of medical records).

Because we hold as a matter of law that insurance companies are not "financial institutions" within the meaning of section 552.112,[17] and that section 552.112 is a permissive exception that government may waive in its discretion, we reverse the summary judgment and dissolve the permanent injunction. *See Risk Managers Int'l v. State,* 858 S.W.2d 567, 569–70 (Tex. App.—Austin 1993, writ denied).

### *Temporary Injunction*

Our reversal of the permanent-injunction order moots one ground for the temporary injunction, but the other ground—that the Quarterly Market Reports are trade secrets—survives. Because we find the district court did not abuse its discretion in granting a temporary injunction on this ground, we affirm the temporary injunction order. We will explain our reasons.

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the suit pending final disposition of the case on its merits. *See Janus Films, Inc. v. City of Fort Worth,* 163 Tex. 616, 358 S.W.2d 589, 589 (1962). To obtain a temporary injunction, the applicant must show a probable right to the relief sought and probable injury in the interim before trial. *See Niemeyer v. Tana Oil & Gas Corp.,* 952 S.W.2d 941, 943 (Tex.App.—Austin 1997, no writ). Probable injury is demonstrated by evidence of imminent harm, irreparable inju-

---

**17.** Our decision that insurance companies are not "financial institutions" for the purposes of section 552.112 renders it unnecessary for us to determine whether Quarterly Market Reports are operating or condition reports within the meaning of section 552.112.

ry, and an inadequate legal remedy. *See Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 597 (Tex.App.—Amarillo 1995, no writ). A trial court order granting a temporary injunction may be reversed only for a clear abuse of discretion. *See Walling v. Metcalfe,* 863 S.W.2d 56, 57–58 (Tex.1993); *Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex. 1981).

*Equal Access.* In his first issue on appeal from the temporary injunction, Birnbaum argues that the trial court abused its discretion by denying him access to the Quarterly Market Reports while permitting their release to TAIPA. In granting the temporary injunction, the trial court found that appellees would suffer immediate, irreparable injury if the Department released to "the public" Quarterly Market Report information for the first quarter of 1996, the second quarter of 1996, or any subsequent quarter. To prevent this harm, the temporary injunction order restrains the Department from directly or indirectly releasing the Quarterly Market Report information to any person or entity but provides that the Department

> may provide access to the number of vehicles on policies at end of previous and current quarters of the Quarterly Market Report Data to the Texas Automobile Insurance Plan Association and Auto Insurance Plan Service Office (AIPSO), only, solely to the extent required for making calculations necessary to implement the incentive programs described section 3(e) of the Texas Insurance Code, article 21.81.

Appellees contend the temporary injunction allows the Department and "its statistical agents" to perform calculations necessary to the implementation of incentive programs "without public disclosure." Appellees argue that if the Quarterly Market Report information is released to a member of the public such as Birnbaum, com-

petitors will be able to acquire the information, ascertain appellees' marketing strategies, and develop their own marketing plans to appellees' detriment. Birnbaum contends that because the temporary injunction allows the Department to provide the information to TAIPA,[18] an association of automobile insurers and a member of the public, the information is necessarily available to the appellees' competitors.

TAIPA's fifteen-member governing body consists of eight persons elected by the member insurers, five public members nominated by the Office of Public Insurance Counsel and selected by the Commissioner of Insurance, and two local recording agents. *See* Tex. Ins.Code Ann. art. 21.81, § 2(b) (West Supp.1999). TAIPA is thus a private entity, in a sense, with a governing body that is largely private. *See Texas Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 486 (Tex.1997) (Hecht, J., concurring in part, dissenting in part, and concurring in the judgment). TAIPA's powers are limited. *See id.* The entity's powers, however, are exercised for a public purpose and in the public interest. In accordance with the plan of operation, TAIPA may make assessments against member companies in proportion to their writing of motor-vehicle liability insurance in Texas, collect funds from member companies to provide for operation of the association, and report to the Commission any failure to pay assessments. *See id.*

Through the performance of these and other statutory duties, TAIPA advises and assists the Commission. *See Lewellen,* 952 S.W.2d at 486. Pursuant to its policy implementation role, TAIPA receives information required to be filed with the Commissioner under the Texas Private Passenger Automobile Statistical Plan. It is therefore incorrect to refer to TAIPA as a "statistical agent." Statistical agents are assigned the task of collecting information

---

**18.** AIPSO, an agent of TAIPA, is not discussed in the record. We will refer to both entities as "TAIPA."

from reporting insurers under a statistical plan. *See* Tex. Ins.Code Ann. art. 21.69(d) (West Supp.1999). The Texas Private Passenger Automobile Statistical Plan designates the Acxiom Corporation as a statistical agent for Quarterly Market Report.

We discern no basis for the trial-court order giving TAIPA access to the information in the Quarterly Market Reports. None of TAIPA's legislatively prescribed duties appear to entitle it to specific data elements contained in the Quarterly Market Reports. *See* Tex. Ins. Code Ann. art. 21.81, § 3(a) (West 1994). In fact, the only authority for TAIPA's access to the reports is TAIPA's plan of operation, authored by TAIPA itself. The trial court tailored a narrow ruling, designed to ensure that the information could be obtained only to the extent required for implementing the incentive program. In our view, this order appears to violate section 552.222 of the Act, which states that a "government body may not inquire into the purpose for which information will be used." Tex. Gov't Code Ann. § 522.222(b) (West Supp.1999); *see also A & T Consultants,* 904 S.W.2d at 676 ("[W]e may not consider the requesting party's purpose or use for the information.").

Appellees argue that there is no evidence that TAIPA is a public requestor of information. We do not find this distinction persuasive. The trial court apparently perceived some room for abuse if the reports were disclosed to TAIPA with *no* instruction limiting their use. It is also contended that there is no evidence that the TAIPA board or TAIPA members must have access to the information to make the calculations necessary to implement the incentive program. We are therefore hard-pressed to understand why TAIPA should receive the Quarterly Market Report information at all, particularly in light of the trial court's finding that appellees probably faced irreparable harm at the hands of competitors, who make up the membership of TAIPA. TAIPA's plan of operation requires that company-specific information be turned over to TAIPA. However, if the information is truly confidential under section 552.110, as appellees maintain, a private entity cannot defeat the statute by ordering its disclosure, even when it is acting as a governmental body.[19] *Cf. Indus. Found. of the South, Inc.,* 540 S.W.2d at 677 ("[W]e do not believe that a governmental agency may bring its information within [the confidentiality exception] by the promulgation of a rule."). It is within our discretion to modify an injunction that is overbroad. *See T–N–T Motorsports v. Hennessey Motorsports,* 965 S.W.2d 18, 25 (Tex.App.—Houston [1st Dist.] 1998, no writ h.). We therefore modify the trial court order to prohibit release of the Quarterly Market Report information to TAIPA.[20]

*Standing.* Birnbaum argues in his second and third issues on appeal that the trial court was without jurisdiction to prohibit release of information contained in reports furnished by insurers not represented in the suit, that is to say, insurers who are not members of the National Association of Independent Insurers or the Alliance of American Insurers, and who are not otherwise parties. Birnbaum also contends that the trial court exceeded its jurisdiction with respect to members of the

**19.** We note that section 552.008 of the Texas Public Information Act authorizes an individual member, agency, or committee of the legislature to obtain information otherwise exempt if it states that the information is requested for legislative purposes. *See* Tex. Gov't Code Ann. § 552.008(b) (West Supp. 1999). We find no authority for the proposition that TAIPA is a legislative body within the meaning of section 552.008, notwithstanding the fact that TAIPA owes its existence to a legislative enactment.

**20.** We note, however, that nothing would prevent the information from being turned over to a legislative member, body, or agency. *See* Tex. Gov't Code Ann. § 552.008(b) (West Supp.1999).

association who are not parties to the lawsuit. Because the question of whether the Quarterly Market Reports are trade secrets depends upon a determination of whether competitive harm will result from release of the information therein, Birnbaum argues that the presence of each affected insurer is required to make a claim of individual harm. Appellees rejoin that the Quarterly Market Reports are excepted from disclosure under section 552.112, pertaining to the operating reports of financial institutions, and they are therefore categorically excepted from disclosure. Consequently, all insurers, whether or not they are members of the insurance and trade associations, will be protected.

"It is a fundamental rule of law that only the person whose primary legal right has been breached may seek redress for an injury." *Nobles v. Marcus,* 533 S.W.2d 923, 927 (Tex.1976). In order to have standing, a party bringing an action must have a justiciable interest in the subject of the action. *See Williams v. Anderson,* 850 S.W.2d 281, 283 (Tex. App.—Austin 1993, writ denied). A trial court does not have subject-matter jurisdiction over an action brought by a party without standing. *See State Bar v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994); *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 445 (Tex.1993). "If the district court lacks jurisdiction ... then its decision would not bind the parties." *Gomez,* 891 S.W.2d at 245.

We hold that the trial court exceeded its jurisdiction when it enjoined the release of records belonging to persons not parties to this lawsuit. We have ruled that the Quarterly Market Reports are not excepted from mandatory public disclosure under section 552.112. The only remain-

ing ground for excepting the reports from disclosure, therefore, is section 552.110, pertaining to trade secrets and confidential and privileged commercial and financial information. The Attorney General, before rendering his opinion on the request for disclosure of the Quarterly Market Reports, invited the 205 insurance companies affected by the request for disclosure to submit reasons why the information should not be released. Several did not respond to the Attorney General's letter, and several are not parties here. Appellees lack standing to assert claims and seek relief on behalf of the affected nonparty insurers, because appellees have no legal or equitable interest in the Quarterly Market Reports furnished by those insurers.[21] We therefore hold the trial court exceeded its jurisdiction when it enjoined the release of records of insurers who were not parties. We modify accordingly the temporary injunction.

Appellees refer by analogy to *Texas Ass'n of Business v. Texas Air Control Board,* 852 S.W.2d 440 (Tex.1993). In *Texas Ass'n of Business,* the Supreme Court held unconstitutional certain statutes that required payment of penalties as a condition to obtaining judicial review. Appellees argue that it would be absurd to conclude that business entities not represented by the Texas Association of Business would be required to comply with an unconstitutional statute. Appellees' argument is inapposite. The statute in question in *Texas Ass'n of Business* applied categorically to all business entities. Section 552.110 is not a categorical exemption for a specific kind of information or document. Instead, it is a fact-specific exemption for information that is found to be a trade secret or privileged and confidential commercial or financial information. Moreover, in light of the legislative sug-

---

21. Our decision does not restrict the right of appellees to submit briefs to the Attorney General asserting reasons why Quarterly Market Reports generally should not be disclosed. The Texas Public Information Act allows "[a] person whose interests may be involved [in

the request for information], *or any other person,* [to] submit in writing to the attorney general the person's reasons why the information should be withheld or released." Tex. Gov't Code Ann. § 552.305(b) (West 1994) (emphasis added).

gestion that we should construe the statutory provisions liberally in favor of disclosing information, we construe section 552.110 to be an affirmative exception, meaning that the party wishing to prevent disclosure bears the burden of showing that the exception applies. Nothing in the record suggests that insurers other than appellees object to the release of the information.

■ Birnbaum also contends that the injunction unlawfully binds members of the appellee associations. In *Texas Ass'n of Business,* the Texas Supreme Court established a three-part test for allowing an association to maintain an action on behalf of its members. According to this test, an association may maintain an action on behalf of its members when 1) its members could otherwise sue on their own; 2) the interests the association seeks to protect are germane to the organization's purpose; and 3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit. *See Texas Ass'n of Bus.,* 852 S.W.2d at 447 (adopting the test from *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

■ Birnbaum disputes that appellee associations have met the third element of the test. He argues that whether the Quarterly Market Reports of a specific company amount to trade secrets or privileged and confidential commercial or financial information depends upon a factual showing of specific harm that would probably result from release of the reports. Because the existence of competitive harm is peculiar to each company, the participation of individual insurance companies is required to establish a claim of harm.

The appellees' position is that release of the Quarterly Market Reports will allow competitors to acquire a complete picture of a particular company's operations, detailed by small geographic units. Competitors will thus be relieved of the burden of making demographic studies, or creating new and innovative ways to market insurance. Instead, they need only review each other's Quarterly Market Reports to determine the success of marketing strategies in those areas.

Appellees produced an expert witness, Dr. Finis Welch, who testified that all automobile insurers in Texas could face competition, and the release of Quarterly Market Report information could harm insurance companies by providing competitors with unique detailed information about a company's success by zip code. Based on Dr. Welch's testimony, the trial court found a sufficient risk of competitive harm to enjoin release of the Quarterly Market Reports until a trial could be held on the merits.

In *Texas Ass'n of Business,* the Texas Supreme Court observed that where an association "seeks only prospective relief, raises only issues of law, and need not prove the individual circumstances of its members to obtain that relief," the third element of the associational standing test is met. 852 S.W.2d at 448. In the case now before us, the appellee associations seek only injunctive relief to prevent disclosure of the Quarterly Market Reports. There is therefore no necessity for each individual member of the association to establish what damages it will probably sustain in order to obtain relief. In addition, the appellee association raises only the issue of whether statutory exceptions to the Public Information Act apply to the Quarterly Market Reports. This issue might properly be termed a mixed question of fact and law, because it is necessary to establish that the insurers will each in fact suffer competitive harm before it becomes necessary to determine whether the Quarterly Market Reports amount to trade secrets or confidential commercial or financial information. *See Apodaca v. Montes,* 606 S.W.2d 734, 736 (Tex.Civ. App.—El Paso 1980, no writ). The trial court, however, apparently believed that Dr. Welch's testimony established that

harm will probably befall any automobile insurer should the reports be released. The trial court was entitled to so appraise and credit Welch's testimony. We therefore hold that the third element of the associational standing test is met, and that the trial court did not exceed its jurisdiction or abuse its discretion by enjoining the release of member insurers' Quarterly Market Reports.

■ *Expert Testimony.* In his fourth issue on appeal, Birnbaum argues that the trial court abused its discretion by receiving over his objection the testimony of Dr. Welch. He argues that appellees failed to disclose in a timely fashion before trial the opinions of Dr. Welch. In addition, he argues that appellees failed to identify the consulting experts upon whose work product Dr. Welch based his opinions.

In their answers to interrogatories, appellees disclosed that Dr. Welch would give his opinions as to the competitive nature of the automobile-insurance market in Texas, the value of Quarterly Market Reports to appellees and their competitors, the harm appellees will probably sustain if the Quarterly Market Reports are disclosed, and whether Quarterly Market Reports are trade-secret and confidential information. Appellees also offered Birnbaum an opportunity to depose Dr. Welch, which Birnbaum refused.[22] Birnbaum asked instead for an expert report. Appellees furnished the ten-page expert report to Birnbaum's counsel at 7:30 p.m. on the last business day before the hearing.

Dr. Welch testified during cross-examination that he had made his general factual observations known to appellees at the time the interrogatories were due. Those factual observations were not, however, disclosed in answers to interrogatories furnished to Birnbaum. Appellees argue that they did provide answers; however, their answers failed to disclose the factual observations and opinions of Dr. Welch. We

find that appellees' answers were nonresponsive, and a violation of Rule 215.5.

■ Rule 215.5 of the Texas Rules of Civil Procedure mandates the exclusion of expert testimony when a party has failed to respond to or supplement responses to discovery. *See* Tex.R. Civ. P. 215.5. An exception exists when a party shows good cause for admitting the evidence. *See id.* The trial court decides in its discretion whether a party has established good cause. *See Dewitt v. Prudential Ins. Co. of Am.,* 717 S.W.2d 414, 417 (Tex.App.—Houston [14th Dist.] 1986, no writ). The scope of review is whether the court abused its discretion. *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 914 (Tex. 1992).

At the temporary-injunction hearing, appellees' counsel offered several reasons why Dr. Welch should be allowed to testify. Counsel explained the substance of the interrogatory answers to establish that there was no surprise regarding the nature of Dr. Welch's proposed testimony. Counsel also noted that she had informed Birnbaum's attorney before the answers were due that Dr. Welch would be a witness, and offered him the opportunity to take Dr. Welch's deposition. She stated that she had been apologetic about the lateness of the report, that it resulted from their own delay in receiving the report, and that in the interest of creating a "fair playing field" she disclosed to Birnbaum's counsel who the remaining witnesses would be and the order in which they would be called. She stated that the expert report was only ten pages long.

The trial court may reasonably have concluded from the record that Birnbaum had adequate opportunity to learn the opinions of Dr. Welch. Although the interrogatory answers were certainly not responsive in any meaningful way, they did provide Birnbaum notice of the topics of the expert's testimony. As appellees'

---

22. Birnbaum observes that for a member of the public, interested merely in enforcing the

Public Information Act, the cost of depositions is prohibitive.

counsel noted, cross-examination would provide Birnbaum an opportunity to examine and test the substance of the expert report. Under these circumstances, we cannot conclude that the trial court's admission of Dr. Welch's testimony was an abuse of discretion. We therefore overrule Birnbaum's fourth issue on appeal.[23]

■ *Irreparable Harm.* In Birnbaum's fifth point of error, he contends the trial court abused its discretion in finding that appellees would suffer irreparable injury absent a temporary injunction. Appellees' witnesses testified that releasing the Quarterly Market Reports information to the public would divulge the following to competitors: (1) volume of revenue per ZIP code; (2) market share per ZIP code; (3) market share changes over time; (4) revenue changes over time; (5) average value of automobiles insured per ZIP code; (6) demand for a particular insurance product in a specific area; and (7) liability limits of policies sold per ZIP code. The witnesses concluded that from this information, competitors could develop marketing plans and business strategies that would mimic the more successful strategies and avoid less successful strategies. Competitors could then identify and prey upon any specific geographic business of an insurer against whom they compete particularly well. In addition, when combined with census information, the Quarterly Market Report information could help competitors determine specific characteristics of customers. According to Dr. Welch, release of the Quarterly Market Reports on either a one-

time or a quarterly basis would result in substantial competitive injury to affected companies.

After reviewing the record, we find the evidence of probable harm is largely conclusory. No evidence demonstrated how, as a practical matter, the release of written premiums and the change in vehicles insured over time per ZIP code[24] could give competitors any real advantage over one another.[25] The information is not customer-specific. In addition, as Dr. Welch acknowledged, a competitor would have to factor out the effect of all other marketing strategies to evaluate the effectiveness of any particular strategy indicated by the Quarterly Market Reports. The information contained in the Quarterly Market Reports, however, includes TAIPA data, meaning that the information includes not only customers who buy on the free market, but customers who are assigned from the high-risk pool. Thus, the information in the Quarterly Market Reports does not isolate customers who are the target of a particular marketing strategy. It would seem, moreover, that the release of all Quarterly Market Reports would leave all insurance companies in the same position, with no one company having an advantage that others did not have. *See Apodaca,* 606 S.W.2d at 736.

■ However, we may not reverse a temporary injunction for abuse of discretion merely because we disagree with a trial court decision. *See Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.

---

23. Birnbaum also argued that appellees' failure to designate Jim Pierce as a consulting expert was error. During the trial, Dr. Welch disclosed that in producing his expert report, he relied to some extent on a draft of an opinion by Jim Pierce. The record is not sufficiently clear to establish that Jim Pierce was actually a consulting expert. We overrule the point of error.

24. State Farm waived its objections to the release of change of vehicles insured per ZIP code, asking for an injunction only with respect to the release of written premium information.

25. Appellees emphasize at various points in their brief the value that data regarding sales per ZIP code has in providing information to competitors of their market share in small geographic areas. In doing so, appellees also implicitly underscore the compelling purpose behind the creation of TAIPA and making this information public, which is to track where companies are selling insurance to ensure that there is not a negative correlation between a community's minority population and the availability of automobile insurance coverage in the standard market.

1991); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). We must "draw all legitimate inferences from the evidence in the light most favorable to the trial court's judgment." *Keystone Life Ins. Co. v. Marketing Management, Inc.*, 687 S.W.2d 89, 91 (Tex.App.—Dallas 1985, no writ). Appellees produced three witnesses who testified as to the harm that would probably result from release of the two Quarterly Market Reports. The trial court had broad discretion to infer findings of fact from the conflicting evidence presented. We cannot say as a matter of law that the court was unreasonable in the facts found. We therefore overrule Birnbaum's fifth point of error.

■ *Section 552.110: Trade Secrets and Confidential and Privileged Information.* Birnbaum contends that the trial court erred in finding that section 552.110 applied to the Quarterly Market Reports. In his order, the trial judge found that "the Quarterly Market Report Data constitute ... trade secrets and confidential commercial or financial information that is excepted from disclosure and is privileged and confidential under § 552.101, et seq., of the Texas Government Code."

■ A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it." *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 766, *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958) (adopting the Restatement of Torts, § 757, cmt. b (1939)). The party claiming the trade secret has the burden of establishing its existence, and its value to the owner. *See Chapa v. Garcia*,

848 S.W.2d 667, 670 (Tex.1992) (applying discovery privilege for trade secrets). Six factors must be established by a claimant, including:

> (1) the extent to which the information is known outside his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting the Restatement of Torts § 757, cmt. b, at 6).

During the trial, Birnbaum essentially conceded that five of the six factors were easily satisfied in the present case.[26] After so doing, Birnbaum cannot now object that members of the associations did not present evidence as to those five factors. Birnbaum's primary contention is that the testimony of Dr. Welch did not reasonably justify a conclusion that competitors would gain an unfair competitive advantage from release of the disputed information.

Whether release of the Quarterly Market Report information will probably result in harm sufficient to give competitors an advantage over appellees is a mixed question of law and fact. The trial judge is entitled to reserve difficult questions of law and fact for full development at trial on the merits. *See Keystone Life Ins. Co.*, 687 S.W.2d at 92. "The ruling on the temporary injunction may not be used to obtain an advance ruling on the merits; the question to be decided on appeal is whether the trial court abused its discre-

---

26. As an example of his contention, Birnbaum explained that the number of pencils a company uses could easily fit the exceptions for information not known outside a company, information that would not be generally known within the company, information that would be protected because it would be part of the operating budget, information that could not be easily discovered, and information that the company expended a significant amount of money to protect due to the costs of the computers and software used to develop an accounting system.

tion in granting or denying the temporary injunction." *Iranian Muslim Org.*, 615 S.W.2d 202, 208 (Tex.1981). As discussed above, the trial court could reasonably conclude that Dr. Welch's testimony had shown the probability of a risk of imminent, irreparable harm should the Quarterly Market Report information be released.

■ The second part of section 552.110 excepts from disclosure "commercial or financial information obtained from a person and privileged or confidential by statute or judicial decision." Tex. Gov't Code Ann. § 552.110. Birnbaum argues that the trial court abused its discretion because the Quarterly Market Report information is not made confidential by judicial decision or statute.

There is a dispute concerning the proper scope of the exception. Appellees claim that the proper scope is that adopted by federal courts for interpreting the Freedom of Information Act. In *National Parks and Conservation Association v. Morton*, the court stated that information is confidential within the meaning of the exception if disclosure is likely either: (1) to impair the government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained. 498 F.2d 765, 766 (D.C.Cir.1974).

Birnbaum claims that the federal interpretation is inapposite because the Texas Legislature provided an explicit measure for determining whether information is privileged and confidential. Unlike its federal counterpart, section 552.110 excepts information that is "confidential or privileged *by judicial decision or statute.*" Tex. Gov't Code Ann. § 552.110 (emphasis added); *cf.* 5 U.S.C. § 552(b)(4) (1996). Birnbaum argues that no statute or judicial decision has made Quarterly Market Report information privileged or confiden-

tial; consequently, the information is not exempt from disclosure. Appellees assert that the language in the Texas statute merely codifies the objective standard that courts have *since* held is implied in the federal statute. Furthermore, they contend that *National Parks* is a judicial decision within the meaning of section 552.112. In support, they cite an opinion of the Attorney General stating that if a government body can meet the test established by *National Parks*, the exception in section 552.110 is established. *See* Tex. Att'y Gen. ORD–652 (1997); *see also Apodaca*, 606 S.W.2d at 736 (applying the *National Parks* test to the disclosure of financial statements relating to a bail-bond permit).

We reject the *National Parks* rationale. Section 552.110 is certain and clear in its reference to information made confidential or privileged by statute or judicial decision. Appellees' contention that *National Parks* is a judicial decision within the meaning of section 552.110 is without merit in our view. *National Parks* created a standard of statutory construction for a statute that *lacked* any stated measure of what constituted confidential information. The Texas statute includes an explicit measure of what constitutes confidential information; there is therefore no need to inquire further respecting this aspect of the legislative intention.

■ Appellees apparently do not dispute that the Quarterly Market Report information has not been made confidential by statute or judicial decision. We therefore modify the temporary injunction order insofar as it excepts Quarterly Market Report information from disclosure under the second element of section 552.110. We affirm, however, the court's temporary injunction order with respect to the Quarterly Market Report information on the basis that it constitutes trade secrets.[27]

---

27. Birnbaum raises two final points of error. First, he asserts that the district court abused its discretion by failing to conduct a substantial evidence review of Rule 5.206 of the Tex-

as Insurance Code, which provides that "[u]pon request, the Department shall publish a listing of the number of average vehicles on policies in force by company by ZIP Code in

## Conclusion

Because we hold that the Quarterly Market Report information is not excepted by section 552.112 of the Texas Public Information Act, we reverse the trial court's summary judgment and dissolve the permanent injunction. We hold that the Quarterly Market Report information is not made confidential and privileged by statute or judicial decision, within the meaning of section 552.110 of the Act. However, we find that the trial court did not abuse its discretion in granting a temporary injunction on the ground that the Quarterly Market Report information amounts to trade secrets. We affirm that part of the trial court judgment issuing a temporary injunction on the ground that the Quarterly Market Report information constitutes trade secrets, but modify the temporary injunction to allow the disclosure of information supplied by nonparty insurers and to delete that part of the order authorizing disclosure of information to TAIPA.

this state." Tex. Ins.Code Ann. art. 1.04(a) (West Supp.1999). Appellees rejoin that the rule is invalid, because the Commissioner of the Department of Insurance has no authority to promulgate rules not authorized by statute. *See* Tex. Ins.Code Ann. art. 1.03A (West 1993). We need not review the validity of the rule because we hold that a rule cannot authorize release of information that is mandatorily excepted from disclosure by statute. *Cf. Indus. Found. of the South, Inc.*, 540 S.W.2d at 677.

Second, Birnbaum argues that the district court abused its discretion in failing to enter findings of fact and conclusions of law in response to his timely request. *See* Tex.R. Civ. P. 297. A trial court's duty to file findings and conclusions is mandatory. *See id.;*

*Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex.1989). The failure to comply with a request to enter findings and conclusions "is presumed harmful unless the record 'affirmatively shows that the complaining party suffered no injury.'" *Southwest Airlines Co. v. Texas High–Speed Rail Auth.*, 867 S.W.2d 154, 160 (Tex.App.—Austin 1993, writ denied) (quoting *Cherne Indus., Inc.*, 763 S.W.2d at 772). In this case, we believe that Birnbaum was not burdened by the trial court's failure. In his briefs to this Court, Birnbaum identified and rebutted the theories by which the trial court might have arrived at its decision to grant a temporary injunction. We therefore find no injury that would justify a remand.