# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00188-CV

**Mike Mauzey and wife, Melissa Kay Mauzey, Individually and as Next Friend of their Minor Daughter, Mikayla Melissa Elaine Mauzey, Appellants**

**v.**

**Lourell E. Sutliff, M.D. and Shannon Clinic, Appellees**

### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT NO. B-00-1371-C, HONORABLE RAE LEIFESTE, JUDGE PRESIDING

## O P I N I O N

This is a medical malpractice action arising from the birth of Mikayla Mauzey who, at birth or soon thereafter, suffered from a respiratory disorder requiring seventeen days= hospitalization. Her parents, appellants Mike and Melissa Mauzey (together the AMauzeys@) sued appellees Lourell E. Sutliff, M.D. and the Shannon Clinic (the AClinic@), Dr. Sutliff=s employer.[1] The district court rendered judgment on the jury=s verdict that the Mauzeys take nothing; the Mauzeys appeal. We will affirm the district-court judgment.

---

[1] In this proceeding, the interests of Dr. Sutliff and the Clinic do not diverge. For convenience we will refer to them jointly as ADr. Sutliff,@ unless individual distinction is required.

**BACKGROUND**

Mikayla Mauzey was born as a result of labor induced by Dr. Sutliff. Mikayla=s gestational age upon delivery was thirty-eight weeks and four days; she was not considered premature. Although the parties dispute the facts surrounding the decision to induce labor, the record indicates that Dr. Sutliff was scheduled to leave town on the anticipated delivery date, and Melissa preferred that Mikayla be born at Shannon Medical Center, a larger hospital in San Angelo, rather than a hospital in Big Spring, where the Mauzeys resided. Shortly after birth, Mikayla developed respiratory difficulties necessitating her transfer to Cook Children=s Hospital in Fort Worth. There, Mikayla received treatment for seventeen days, requiring a ventilator to assist her breathing for part of the time. Once Mikayla achieved normal respiration, the hospital released her. The parties also dispute the specific medical infirmity affecting Mikayla. The Mauzeys= expert testified that Mikayla suffered from Arespiratory distress syndrome [ARSD@], including hyaline membrane disease [AHMD@] and persistent pulmonary hypertension of a neonate@;[2] Dr. Sutliff=s expert diagnosed the problem as Apulmonary hypertension of an unknown cause@; Mikayla=s neonatal physician identified her ailment as pulmonary hypertension, which may or may not be associated with HMD.

The Mauzeys filed suit, originally naming Shannon Medical Center and two of its nurses in addition to Dr. Sutliff and the Clinic. Shortly thereafter, the Mauzeys nonsuited all but Dr. Sutliff and the Clinic. *See* Tex. R. Civ. P. 162. The five-day trial centered on the testimony of four physicians, one of

---

[2] HMD results from immature lungs, which cannot produce surfactant. Surfactant is a liquid substance in the lungs that prevents the lungs from collapsing upon exhalation. RDS is a clinical syndrome that may result from a variety of cardiopulmonary disorders as well as HMD. Pulmonary hypertension is a respiratory problem that also can have many causes, and it can be associated with HMD.

whom was Dr. Sutliff. Four expert witnesses were called by the Mauzeys: (1) Dr. Sutliff, called as an adverse witness; (2) Dr. David Turbeville, Mikayla=s treating neonatologist at Cook Children=s Hospital; (3) Dr. Russel Jelsema, the Mauzeys= retained expert; and (4) Dr. Micheal Stephens, Melissa=s and Mikayla=s treating family practitioner. Dr. Sutliff also retained a testifying expert, Dr. Richard Stanley. On the basis of the jury=s finding of no liability, the district court rendered a take-nothing judgment against the Mauzeys, who now appeal.

## DISCUSSION

By two issues, the Mauzeys assert that the district court erred in failing to exclude Dr. Stanley=s testimony because of an inadequate discovery disclosure and in refusing to allow the Mauzeys, by way of overhead projector, to display to the jury two tables published in learned treatises.

### *Standard of Review*

We review a trial court=s decision relating to discovery sanctions for an abuse of discretion. *See Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986); *Pape v. Guadalupe-Blanco River Auth.*, 48 S.W.3d 908, 912 (Tex. App.CAustin 2001, pet. denied). We apply the same standard to determine whether the trial court erred in an evidentiary ruling. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *Codner v. Arellano*, 40 S.W.3d 666, 674 (Tex. App.CAustin 2001, no pet.). Under such standard, we will reverse the trial court only when we find that the court acted in an unreasonable or arbitrary manner, or without reference to any guiding rules or principles. *Beaumont Bank*,

3

*N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

***Dr. Stanley=s Testimony***

By their first issue, the Mauzeys attack the district court=s decision to admit Dr. Stanley=s testimony. The issue stems from the district court=s March 2, 2001 scheduling order, which directed the Mauzeys to designate their expert witnesses by September 28 and Dr. Sutliff to designate his expert witnesses by October 31. The order instructed the parties to provide: AA list including each expert=s name, address, and report of the witness= testimony . . . .@[3]

On October 31, Dr. Sutliff responded, designating Dr. Stanley as an expert. He provided Dr. Stanley=s address and telephone number and attached a brief letter, which Dr. Sutliff characterizes as a Areport.@ The letter, addressed to Dr. Sutliff=s attorneys and dated October 22, provides the basis for the conflict before us and reads as follows:

> I have had the opportunity to review the following records, depositions, and documents. 1) medical records of Shannon West Texas Memorial Hospital and Shannon Clinic of Melissa Mauzey. 2) plaintiff=s original petition. 3) deposition of Dr. Lourell Sutliff, M.D. 4) plaintiff=s expert opinion of Dr. Russel D. Jelsema, M.D. of Michigan.

> I am a Board Certified OB-Gyn and have been in private practice of Obstetrics and Gynecology in Abilene, Texas for the past 25 years. I have reviewed the above listed records and based upon my training and years of clinical experience, I find the care provided for Melissa Mauzey to be within the standard of care expected for physicians caring for pregnant women.

---

[3] The scheduling order was signed by Judge Ben Woodward.

4

On the same day, Dr. Sutliff also filed ASecond Supplemental Responses to [the Mauzeys]= Request for

Disclosure,@ stating that

> Dr. Stanley will testify to the applicable standard of care in the treatment of Melissa
> Mauzey, on whether Dr. Sutliff breached the applicable standard of care in his treatment of
> Melissa Mauzey and on whether any violation of the standard of care by Dr. Sutliff in his
> treatment of Melissa Mauzey was the proximate cause of damages to Mikayla Mauzey
> and/or [Mike and Melissa Mauzey].

In response to the Mauzeys= request that he provide Athe general substance of [Dr. Stanley]=s mental

impressions and opinions and a brief summary of the basis for them,@ Dr. Sutliff responded, ASee report,@

referring to Dr. Stanley=s October 22 letter. A brief resume of Dr. Stanley was attached.[4]

On November 19, the Mauzeys, by letter to Dr. Sutliff=s attorneys, questioned the

sufficiency of the Areport@:

> I believe the report prepared by your expert, Richard D. Stanley, M.D., dated October 22,
> 2001, fails to meet the letter or the spirit of the Texas Rules of Civil Procedure or the
> Court=s Scheduling Order. If you wish to submit a new report containing the general
> substance of his mental impressions and opinions and a brief summary of the basis for them,
> I need it by noon, Wednesday, November 28, 2001, so Dr. Jelsema can review it prior to
> his deposition testimony that Friday.

Dr. Sutliff responded the next day:

---

[4] The record presented to this Court contains neither a request for disclosure by the Mauzeys nor
any earlier response by Dr. Sutliff.

I disagree regarding Dr. Stanley=s report. The Court=s Scheduling Order only required a report be supplied. Further, as a Defendant, I have no obligation to supply an expert report except on order of the Court, which I have done. As we discussed, I have no 4590i requirements. More importantly, we have supplemented our disclosure responses and complied with the requirements of that rule. Once again, I will be happy to get dates for you to take Dr. Stanley=s oral deposition should you wish to depose him as provided by Rule 195, Tex. R. Civ. P.

The scheduling order established a December 14 discovery deadline, but provided that it could be extended by agreement of the parties. The Mauzeys, however, did not seek to take Dr. Stanley=s deposition. Although the district court held pretrial hearings on discovery disputes on December 9 and 17, the Mauzeys lodged no objection to the adequacy of Dr. Stanley=s Areport@under either the district court=s scheduling order or the discovery rules germane to expert witnesses and their reports.

On January 9, 2002, nineteen days before trial[5] and twenty-six days after the close of scheduled discovery, the Mauzeys filed a written motion to exclude Dr. Stanley=s testimony, arguing that the October 22 letter Adoes not provide any summary of Dr. Stanley=s mental impressions, opinions, or the basis for them.@ The motion further asserted that Dr. Sutliff has

wholly failed to provide Dr. Stanley=s mental impressions and opinions, much less the facts known to Dr. Stanley that relate to or form the basis of his mental impressions, despite the fact that the parties were ordered to provide a report by the Court. As communicated to [Dr. Sutliff] via [the Mauzeys= November 19] letter referred to herein above [sic], the

---

[5] The scheduling order established that trial would commence on either January 21 or 28, 2002. The trial actually began January 28.

**6**

report of Dr. Stanley fails to comply with either the letter or the spirit of the Texas Rules of Civil Procedure or the Court=s Scheduling Order.

The Mauzeys argued that the Areport@ was Awholly inadequate,@ should be treated by the court Aas a failure to provide a report all together [sic],@ and the court Ashould disallow the testimony of Dr. Richard D. Stanley, M.D., in its entirety.@ The Mauzeys= final opposition to Dr. Stanley=s testimony came during trial, when they objected both before and during his testimony that the matters to which he was testifying had not been included in the October 22 letter. The district court, after a hearing, denied the Mauzeys= motion to exclude Dr. Stanley=s testimony and overruled the Mauzeys= trial objections.

In this Court, the Mauzeys contend that because Dr. Stanley=s October 22 letter is so lacking in substance as to be no report at all, the district court was required to automatically exclude Dr. Stanley=s testimony and reversibly erred when he declined to do so. Dr. Sutliff responds to the contrary, arguing that the district court did not err in admitting Dr. Stanley=s testimony, and that even if the letter fails as a report, Dr. Stanley=s testimony was cumulative and its result harmless. The Mauzeys also assert that, if the letter is sufficient to constitute a Areport,@ Dr. Stanley should not have been allowed to give opinions beyond those contained in the letter.

We will first determine whether the district court should have allowed Dr. Stanley to testify at all. The Texas Rules of Civil Procedure provide: AWhen responding to written discovery, a party must make a complete response, based on all information reasonably available to the responding party or its attorney at the time the response is made.@ Tex. R. Civ. P. 193.1. As is relevant here, a party may discover the subject matter on which a testifying expert will testify, the relevant facts known to the expert,

**7**

the expert=s mental impressions and opinions made in connection with the case, and any methods used by the expert to derive his impressions and opinions. Tex. R. Civ. P. 192.3(e). Similar information is available to a party upon a proper request for disclosure: (1) Athe general substance of the expert=s mental impressions and opinions and a brief summary of the basis for them . . . .@ Tex. R. Civ. P. 194.2(f)(3); and (2) Aall documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert=s testimony.@ Tex. R. Civ. P. 194.2(f)(4)(A). A party failing to make, amend, or supplement a discovery response in a timely manner may not introduce Ain evidence the testimony, material, or information that was not timely disclosed,@unless there is good cause for such failure or the failure to disclose will not unfairly surprise or prejudice the other party. Tex. R. Civ. P. 193.6(a).

The Mauzeys direct this Court to several cases to support their contention that the district court was required to automatically exclude Dr. Stanley=s testimony. In *VingCard A.S. v. Merrimac Hospitality Systems, Inc.*, Merrimac, in response to a request for disclosure, identified the subject matter on which its expert might be called to testify but did not disclose Ahis mental impressions and opinions, nor a brief summary of the basis for those opinions.@ 59 S.W.3d 847, 854 (Tex. App.CFort Worth 2001, pet. denied). Moreover, Merrimac provided no documents, data, or reports reviewed or prepared by the expert. *Id.* at 855-56 (citing Tex. R. Civ. P. 194.2(f)(4)). The expert=s testimony was allowed over objection made for the first time at trial. *Id.* at 856-57. The court of appeals held that Merrimac=s responses were not simply inadequate, but that Merrimac Awholly failed to respond@in compliance with the rule, and that the trial court erred in admitting the expert=s testimony in light of rule 193.6. *Id.* The court

observed that AMerrimac made no attempt to establish good cause, lack of surprise, or lack of prejudice.@ *Id.* at 856. The court, however, found the error harmless, as the admitted testimony proved cumulative. *Id.* at 859.

*Reichhold Chemicals v. Puremco Mfg. Co.* concerned the failure to provide an expert=s report more than thirty days before trial. 854 S.W.2d 240 (Tex. App.CWaco 1993, writ denied). In discovery, Reichhold had requested information on how Puremco had computed its damages. Thirty-three days before trial Puremco supplemented its previous discovery response and advised that the damage calculations were available in a report prepared by an expert, Awhich is available for review.@ *Id.* at 245. When, at trial, Puremco attempted to offer the expert=s testimony, Reichhold objected. *Id.* Reichhold argued, and Puremco agreed, that Reichhold=s attorney in charge was not provided a copy of the report outside of thirty days before trial. *Id.* at 245-46. Thus, testimony should be excluded under previous rule 215.5.[6] *Id.* The trial court allowed the testimony, but the court of appeals reversed, holding that Puremco did not offer good cause for its failure to timely provide the report, *id.* at 246, and that Reichhold demonstrated harm, because Puremco relied heavily on the testimony and the testimony=s admission probably resulted in an improper judgment, *id.* at 249. We do not find *Reichhold Chemicals* controlling. Here, when the district court denied the Mauzeys= motion to exclude Dr. Stanley=s testimony, Dr. Sutliff was

---

[6] Former rule 215.5 is the predecessor to and is substantially the same as the present rule 193.6. *Compare* Tex. R. Civ. P. 193.6, *with* 215.5 (1984, amended and renumbered 1999). The *Reichhold Chemicals* court refers to the former rule as ARule 215(5),@ *Reichhold Chems. v. Puremco Mfg. Co.*, 854 S.W.2d 240, 245 (Tex. App.CWaco 1993, writ denied), while this Court has referred to the rule as ARule 215.5,@ *Birnbaum v. Alliance of Am. Insurers*, 994 S.W.2d 766, 781 (Tex. App.CAustin 1999, pet. denied). We will refer to the rule as in *Birnbaum*.

entitled to rely on that ruling insofar as testimony regarding the disclosures made in the October 22 letter and had no duty to supplement his earlier discovery response.

The Mauzeys also seek support from *Dennis v. Haden*, arguing that a party is entitled to rely on the fact that if no report is furnished, the expert will not be allowed to testify. 867 S.W.2d 48, 51-52 (Tex. App.CTexarkana 1993, writ denied). This case is distinguishable as well. In *Dennis*, the trial court permitted an expert witness to testify when the proffering party had not provided its opponent with a written report, as ordered by the court. *Id.* at 50-51. The court of appeals disagreed and reversed and remanded the case for a new trial. *Id.* at 52. The court opined that a party had the right to rely on the fact that if its opponent desired to call an expert, the opponent would submit a written report to the other side. *Id.* at 51. The issue before this Court is not the complete *lack* of a report, but the adequacy of what was submitted.

In *Taylor Foundry Co. v. Wichita Falls Grain Co.*, Taylor Foundry argued that the trial court erred in admitting an expert=s testimony after the grain company allegedly did not disclose the substance of the expert=s mental impressions and opinion in accordance with rule 194.2(f)(3). 51 S.W.3d 766, 772-73 (Tex. App.CFort Worth 2001, no pet.). The parties argued a number of issues, including whether the rule applied at the time the witness was designated. *Id.* However, the court of appeals found the trial court acted within its discretion because the court, as gatekeeper of evidence, conducted a full evidentiary hearing on the proposed testimony and the court=s ruling was supported by Aample@evidence. *Id.* Here, the district court likewise conducted a pretrial hearing on the Mauzeys=motion to exclude. In

response to the Mauzeys= argument against the adequacy of Dr. Stanley=s opinion that there was no deviation from the standard of care, the court opined:

> [W]hen you=re stating a negative, I don=t think that you should have to state the basis upon which you found the negative. In other words, a negative is a negative. I don=t find any deviation in the standard of care; and I don=t think when you state the negative you=re expected to say: And the reason I don=t is that⎯Here is all the care I saw, each and every step, and I find them all to be okay. To me, that sounds like it=s included in the statement that says: I don=t find any deviation of care.

Moreover, the court stated, AI really believe that the rules contemplate that the deposition would have provided that opportunity to ask the doctor each of those detailed questions.@ After hearing from both sides, the court responded that he would Atake the matter under advisement . . . but I=m inclined to deny that motion.@ The court later denied the Mauzeys= motion to exclude.

Dr. Sutliff counters that although he did not supplement, as informally requested by the Mauzeys, he did make Dr. Stanley available for deposition. Similarly, he contends that the Mauzeys should have filed a motion to compel or motion for continuance. He correctly points out that the Mauzeys could have done more to protect themselves. It would not have been difficult for the Mauzeys to depose Dr. Stanley, considering that Dr. Stanley=s office was in Abilene and the Mauzeys=attorneys practiced in nearby Big Spring. Furthermore, the Mauzeys released their expert to leave the state after testifying, when they might have retained him longer or sought a continuance to effectively rebut Dr. Stanley=s testimony.

At the hearing on the Mauzeys= motion to exclude, Dr. Sutliff=s counsel advised the court that Dr. Stanley

is going to take the stand. He=s going to talk about his qualifications. He=s going to talk about what I asked him to review, what he did review, which is identified in his report and in our Disclosure Responses; and he=s going to tell this jury whether or not Lourell Sutliff deviated from the standard of care that caused Mikayla Mauzey=s damage. I have more than complied with the rules.

. . . .

They know who this expert was [sic]. . . . I think the report is adequate. I think I designated appropriately. I think my Disclosure Response is accurate. You want his deposition; you give me some dates and I=ll give them to him.

. . . .

. . . We believe that the disclosure, the supplements to it, the report and the expert designation comply exactly with what the rules require, and that Doctor Stanley ought to be allowed to talk about the materials identified that he relies upon in rendering his opinion.

He=s not done any tests. He=s not done any photographs. He=s not made any calculations. He doesn=t have any factual observations, any different from what is reflected in the medical records . . . .

. . . They know about him. They know what he=s going to talk about. They know every piece of paper that he=s seen, every piece of paper that he=s going to rely upon, as well as his experience. They have his C.V. They are fully prepared to be able to cross examine this doctor. And did they feel they were not, all they had to do was give me a date for his deposition.

In *Birnbaum v. Alliance of American Insurers*, this Court found answers to interrogatories unresponsive when they failed to disclose the expert=s factual observations and opinions. 994 S.W.2d 766, 781 (Tex. App.CAustin 1999, pet. denied). We noted that the rule Amandates the exclusion of expert testimony when a party has failed to respond to or supplement responses to discovery.@ *Id.* However, we also recognized the good-cause exception and that the Atrial court observes in its discretion whether a party has established good cause@ for the admission of otherwise inadmissible expert

**12**

testimony.  *Id.*  After conducting a hearing, the trial court, over Birnbaum=s objection, allowed the expert, Dr. Finis Welch, to testify.  After reviewing a record not dissimilar to the one now before us, we stated:

> The trial court may reasonably have concluded from the record that Birnbaum had adequate opportunity to learn the opinions of Dr. Welch.  Although the interrogatory answers were certainly not responsive in any meaningful way, they did provide Birnbaum notice of the topics of the expert=s testimony.  As appellees= counsel noted, cross-examination would provide Birnbaum an opportunity to examine and test the substance to the expert=s report.  Under these circumstances, we cannot conclude that the trial court=s admission of Dr. Welch=s testimony was an abuse of discretion.

*Id.* at 781-82.

By any standard, Dr. Stanley=s October 22 letter is a pitiful example of an expert=s Areport.@  The district court, however, had the opportunity to consider the court=s scheduling order, the applicable rules of civil procedure, and the arguments of the parties and, in his discretion, held Dr. Sutliff=s responses adequate.  As in *Birnbaum*, we cannot conclude that the district court=s decision to allow Dr. Stanley to testify *as to the standard of care* Dr. Sutliff observed in treating Melissa was unreasonable or arbitrary.

Our conclusion, however, does not end our inquiry because the Mauzeys also assert error by the district court in allowing Dr. Stanley to testify as to matters other than the applicable standard of care.  They specifically argue that the court erred in allowing Dr. Stanley to testify concerning:  (1) whether the induction of Melissa=s labor was elective or medically indicated; (2) his opinion of Mikayla=s gestational age; (3) his personal practice as a physician; (4) the use of medical bulletins; (5) the risks associated with amniocentesis; and (6) causation.  At trial the Mauzeys only objected to Dr. Stanley=s testimony regarding his personal practice in documenting patients= psychological issues and whether he had conducted both

**13**

medical and elective inductions at a gestational age of greater than thirty-eight weeks. We examine error only as to these objections because the Mauzeys failed to object to the testimony regarding the other issues. *See* Tex. R. App. P. 33.1 (to preserve error for appellate review, party must have presented to trial court a timely request, objection, or motion stating its specific complaint). Because the objected-to subject matter was outside the scope of the report, when viewed in its most favorable light, we conclude that it was error for the district court to allow this testimony over the Mauzeys= objections.

We must now determine whether the error constituted reversible error. *See VingCard*, 59 S.W.3d at 859; *Reichhold Chemicals*, 854 S.W.2d at 249. To constitute reversible error, we must conclude that the trial court=s error Aprobably caused the rendition of an improper judgment.@ Tex. R. App. P. 44.1(a)(1); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). Dr. Sutliff argues that Dr. Stanley=s testimony was cumulative to that of the other experts, and therefore the testimony=s admission was harmless. The Mauzeys counter that there were only Atwo real issues, and Dr. Stanley testified as to both.@ These two issues were: (1) Athe applicable standard of care and whether appellee breached it by electively inducing appellant=s labor prior to 39 weeks gestation without documented pulmonary maturity by amniocentesis,@ and (2) Acausation, i.e., whether such breach of the standard of care proximately caused the baby to [be] born with [HMD].@ We conclude that the cumulative nature of the testimony renders the error harmless.

Dr. Sutliff testified that he had a medical reason to induce labor: Melissa=s anxiety and fear of a problematic birth. He testified that Melissa expressed fear that the baby might breech and, in his words Athat something was going to happen to that baby.@ Dr. Sutliff testified that fetal maturity in 1998 was

**14**

established at thirty-eight weeks gestation, and that he believed Athe incidence of pulmonary immaturity at that stage is less than one in a thousand . . . so we had a ninety-nine point nine percent assurance that this baby=s lungs were mature.@ Dr. Sutliff also testified as to the reasons he did not perform an amniocentesis prior to induction, and the fact that the procedure could detect HMD but not pulmonary hypertension. Finally, Dr. Sutliff testified that he did not violate the standard of care in delivering Mikayla. Dr. Sutliff, however, did admit that he chose not to annotate Melissa=s fear and anxiety in her medical record because her feelings were not uncommon and such annotations were unwarranted.

Dr. Stanley testified that Dr. Sutliff did not deviate from the standard of care when he induced Melissa=s labor. Dr. Stanley also testified that Dr. Sutliff=s decision not to perform an amniocentesis, in an effort to detect the potential for underdeveloped lungs at thirty-eight weeks and four days gestation, did not deviate from the standard of care. His opinion would be the same whether Dr. Sutliff=s decision to induce Melissa was medically necessitated or elective. On cross-examination, Dr. Stanley did admit that his information was based only on Dr. Sutliff=s deposition and office medical records.

Dr. Stephens testified that he currently treats Melissa and Mikayla as their family practitioner. On cross-examination, Dr. Stephens testified that he had annotated in Melissa=s medical records Melissa=s self-described history of depression, dating back five years to about 1995, which would include the period before Mikayla was born. He testified that he had recently treated Melissa for depression and agoraphobia[7] with antidepressants. Melissa=s medical records also revealed that another

---

[7] Agoraphobia is an Aabnormal fear of crossing or of being in the midst of open spaces.@ *Webster=s Third New International Dictionary* 43 (Philip B. Gove ed., 1961).

**15**

doctor at the same clinic where Dr. Stephens was employed had earlier recommended that Melissa seek treatment from a psychologist.

Dr. Turbeville, Mikayla=s treating neonatal physician, testified as the Mauzeys= witness to the possible causes of Mikayla=s respiratory distress and the type of care she received in Fort Worth. It was his opinion that the cause of Mikayla=s respiratory problems was uncertain. Although his initial diagnosis was HMD, he testified on cross-examination that HMD was unlikely because Mikayla=s Apgar test, scored at birth, indicated that her breathing was normal shortly after delivery.[8] He stated that Mikayla=s respiratory distress, occurring a few hours after birth, was indicative of problems not associated with underdeveloped lungs. He opined that Mikayla most likely suffered from pulmonary hypertension of an unknown origin, but he did not rule out the possibility of HMD. He admitted that confirming HMD was only possible by way of biopsy, which was not performed. Dr. Turbeville further testified that in most cases where infants are admitted with respiratory disorders, the procedure is to treat them as if HMD were the cause even though it may not be the problem. This, he said, was the reason for his initial diagnosis of HMD.

Dr. Jelsema contradicted Dr. Sutliff=s, Dr. Stanley=s, and Dr. Turbeville=s testimony. He testified that, in his opinion, there was no medical reason for Dr. Sutliff to induce labor, and that such

---

[8] The Apgar test generates a score of the infant=s immediate post-birth condition based on various observations. In scoring the infant, the physician observes such characteristics as crying, respiration, color, and muscle tone. The test is conducted at one and five minutes after birth. The maximum score is ten. Mikayla scored eight at one minute and nine at five minutes, indicating normal respiration.

induction, performed without the benefit of amniocentesis, resulted in the birth of Mikayla before her lungs had fully developed. Dr. Jelsema testified that the standard of care applicable in this case required Dr. Sutliff to document pulmonary maturity by amniocentesis for an elective induction of labor before thirty-nine weeks gestation. He testified that he believed Mikayla suffered from HMD but admitted that confirming HMD was only possible by way of biopsy, which was not done. He also admitted that his area of practice did not involve care of infants after birth. When asked about the incidence of RDS in infants induced at thirty-eight weeks gestation, Dr. Jelsema testified that in one study Athere were forty-five babies . . . and one of those babies had respiratory distress problems.@ On cross-examination he conceded that induction at thirty-eight weeks and beyond was medically acceptable, and that a baby born at thirty-eight weeks was not considered premature. He also testified that an amniocentesis does not guarantee detecting HMD, and the test would not have detected pulmonary hypertension of an unknown origin.

The Mauzeys offer *Boothe v. Hausler* to support their argument that Dr. Stanley=s testimony was not merely cumulative. 766 S.W.2d 788 (Tex. 1989). In *Boothe*, the trial court permitted Hausler=s wife to testify on his behalf, despite the fact that he failed to supplement his answers to interrogatories to advise Boothe of his wife=s whereabouts. Boothe was thus unable to serve the wife with a subpoena, depriving him of the opportunity to take her pretrial deposition. Applying the harmless-error standard, the supreme court held that her testimony was not cumulative and may have been crucial to the jury=s determination, because the wife was the only nonparty witness called by Hausler to dispute Boothe=s allegations that Hausler had assaulted him. *Id*. at 789. Thus, it was error to admit the testimony without a showing of good cause. *Id.*

**17**

*Boothe*, however, is distinguishable. In the instant case, Dr. Stanley=s testimony regarding his personal practice in documenting patients= psychological issues and whether he had conducted both medical and elective inductions at a gestational age of greater than thirty-eight weeks were not Amaterial issue[s] dispositive of the case.@ *Id*. The cumulative nature of the evidence is apparent. Dr. Stephens=s testimony corroborated Dr. Sutliff=s testimony concerning Melissa=s depression and anxiety existing before Mikayla=s birth. Additionally, Dr. Turbeville testified that Mikayla=s respiratory distress was probably caused by pulmonary hypertension of an unknown origin, which may or may not be associated with HMD, an opinion supporting Dr. Sutliff=s actions because amniocentesis would not have detected pulmonary hypertension of an unknown origin. Dr. Stanley testified that Dr. Sutliff did not deviate from the standard of care, while Dr. Jelsema testified as to the requisite standard of care in light of Dr. Sutliff=s actions. Therefore, absent Dr. Stanley=s testimony that was admitted in error, the jury was left to consider the testimony offered by the five physicians: (1) Dr. Sutliff=s opinion that Melissa suffered from anxiety concerning Mikayla=s birth and that induction absent amniocentesis was proper; (2) Dr. Stanley=s opinion that Dr. Sutliff did not deviate from the standard of care; (3) Dr. Stephens=s testimony that Melissa had suffered from depression and anxiety before Mikayla=s birth; (4) Dr. Turbeville=s opinion that Mikayla suffered from a medical infirmity unrelated to a premature induction of labor; and (5) Dr. Jelsema=s belief that induction was improper, as was Dr. Sutliff=s failure to document Melissa=s psychological concerns. In reviewing the disputed evidence, we bear in mind that the jury is the sole judge of the credibility of the witnesses and is entitled to accept or reject any testimony it wishes, as well as to decide what weight to give the testimony. *Simons v. City of Austin*, 921 S.W.2d 524, 531 (Tex. App.CAustin 1996, writ denied).

**18**

The jury apparently found the other physicians= testimony more persuasive than Dr. Jelsema=s or gave their

testimony more weight.  We overrule the Mauzeys= first issue.

*Visual Presentation of Learned Treatises*

By their second issue, the Mauzeys argue that the district court erred in refusing to allow the jury, by means of an overhead display, to view two tables taken from learned treatises. The tables at issue displayed the incidence rate of RDS in infants born at various gestational ages. One table, titled AIncidence and mortality rate of RDS,@ contained three columns: (1) AGestational Age (weeks),@ (2) ANo. of Live Born Infants,@ and (3) AIncidence of RDS (%).@ The rows under each column represented the results of the study for different gestational ages, with the first row being greater than forty weeks and the bottom row twenty-nine to thirty weeks. By choosing the gestational age under the first column, a reader could determine the number of infants studied in each group and the group=s RDS incidence rate. The row applicable to this case concerned infants with a gestational age of between thirty-seven and thirty-eight weeks. The number of live infants born was 1392, and the incidence of RDS was 0.80%. Dr. Sutliff, however, disputed these numbers on cross-examination, arguing that Mikayla fell between the 37-38 week row and the 39-40 week row, because her gestational age at birth was thirty-eight weeks and four days. The second table was similarly formatted, and it represented that one in forty-five infants born through induced labor at thirty-seven to thirty-eight weeks suffered from RDS. During Dr. Sutliff=s direct testimony, he stated that the rate of pulmonary immaturity in infants born at thirty-eight weeks was less than one in one thousand. Seeking to impeach Dr. Sutliff with contrary incidence rates, the Mauzeys requested that the two tables be displayed to the jury while Dr. Sutliff was questioned. Dr. Sutliff objected, arguing that a learned treatise may be read into evidence but may not be received as an exhibit. *See* Tex. R. Evid. 803(18) (statements from learned treatise may be read into evidence but may not be received as exhibit). The district court agreed, and the applicable portions of the tables were only read into evidence by the Mauzeys= counsel.

**20**

The Mauzeys contend that during the testimony, the applicable standard of care was misrepresented to the jury by Dr. Sutliff. The Mauzeys argue that this misrepresentation and the inability to visually display the tables while attempting to impeach Dr. Sutliff confused the jury and probably resulted in the rendition of an improper verdict. The Mauzeys urge that the purpose of rule 803(18) is to prevent the jury from drawing improper inferences, without guidance, from technical information contained in the learned treatise, which the tables do not display. Dr. Sutliff responds that the district court did not abuse his discretion. Additionally, he argues that the ruling was correctly based on the language of the rule and, even if erroneous, the error was harmless.

Rule 803(18) does not prohibit the *display* of such tables. It is a general hearsay exception for the information found in learned treatises:

> Learned Treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. *If admitted, the statements may be read into evidence but may not be received as exhibits.*

Tex. R. Evid. 803(18) (emphasis added). The issue is whether the district court reversibly erred in strictly adhering to the Aread into evidence@ language of the rule. In support of their position, the Mauzeys direct this Court to Texas criminal cases and cases from other jurisdictions.

*United States v. Mangan* is the most instructive and is also cited in the criminal cases. 575 F.2d 32, 48 (2d Cir. 1978). In *Mangan*, the defendant desired to cross-examine the government=s handwriting expert concerning his testimony that the defendant=s handwriting exhibited certain

**21**

characteristics. *Id.* The defendant attempted to introduce several charts extracted from a learned treatise. The trial court rejected the introduction of the charts into evidence, citing the last sentence of the Federal Rule of Evidence 803(18).[9] *Id*. The court permitted the jury to view the charts during defendant=s cross-examination of the expert but prevented the jury access to the charts during their deliberations. *Id.* Upholding the decision on appeal, the court of appeals opined that it would be difficult for a chart to be read into evidence, Aand good sense would seem to favor its admission into evidence, at least in a case where, as here, its significance had been fully explored with the expert.@ *Id.* The *Mangan* court noted that it could not fault the trial judge for Areading the black letter as closely as he could.@ *Id.* The court observed that A[t]he Advisory Committee=s Note shows that the purpose of the last sentence was to prevent a jury from rifling through a learned treatise and drawing improper inferences from technical language it might not be able properly to understand without expert guidance.@ *Id.* at n.19. In the Mauzeys= case, there was no danger that the jury would have misinterpreted the information or rifled through other parts of the learned treatises, because this was the only portion of the learned treatises the jury would have seen.

Additionally, the Mauzeys cite *Loven v. State*, 831 S.W.2d 387 (Tex. App.CAmarillo 1992, no pet.). In *Loven*, the trial court allowed the jury to view an instructional video, which was admitted into evidence and taken to the jury room. *Id*. at 397. On appeal, the court held that a video could be admitted as a learned treatise and therefore shown to the jury when offered in conjunction with an expert=s

---

[9] Texas adopted the state rule *verbatim* from the Federal Rule of Evidence 803(18). *See* Hulen D. Wendorf, et al., *Texas Rules of Evidence Manual* ' VIII at 129 (6th ed. 2002).

testimony. *Id.* The court also ruled that admitting the video into evidence was error and in violation of the last sentence of rule 803(18); however, because the jury had no way to watch the video, the error was harmless. *Id.*

Here, it is undisputed that the information contained in the tables was read into the record during Dr. Sutliff=s testimony. The Mauzeys= impeachment may have been more effective had the jury actually viewed the tables. However, as in *Mangan,* we cannot fault the district court for following the language of 803(18). The decision to display tables from learned treatises was properly within the district court=s discretion. Therefore, we cannot say that the district court=s evidentiary ruling was an abuse of that discretion. The Mauzeys= second issue is overruled.

**CONCLUSION**

Although we hold that Dr. Stanley=s October 22 letter barely suffices as an expert=s report, thereby allowing Dr. Stanley to testify as to the matters disclosed within its four corners, it falls short of satisfying the spirit of full evidentiary disclosure. Here, once the district court ruled in advance of trial that he would allow Dr. Stanley to testify, the Mauzeys could have done more to determine the extent of Dr. Stanley=s proposed testimony. Under these circumstances, the district court did not abuse his discretion in allowing the testimony at trial. However, we urge trial courts to carefully consider such matters and ensure that a pretrial expert report fully discloses the breadth and substance of the expert=s mental impressions and their basis. We also urge trial courts to exercise their discretion in a manner that allows a case to be fully developed before the jury. Although we cannot say that the district court abused his discretion in denying

23

the Mauzeys= request to exhibit the learned-treatise tables by overhead projector when cross-examining Dr.

Sutliff, such exhibition would not have violated evidentiary rule 803(18).

We affirm the district court=s judgment.

_____

Lee Yeakel, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed:   April 17, 2003